**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
TEENA FOY,                    )
                              )
             Plaintiff,       ) Case No: 4:24cv140
                              )
        v.                    ) Tallahassee, Florida
                              ) May 2, 2024
FLORIDA COMMISSION ON OFFENDER )
REVIEW, et al.,               )
                              ) 1:09 PM
             Defendant.       )
_____)
```

**TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 131)**

```
Court Reporter:              MEGAN A. HAGUE, RPR, FCRR, CSR
                            111 North Adams Street
                            Tallahassee, Florida 32301
                            megan.a.hague@gmail.com
```

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

```
 1    APPEARANCES:

 2    For the Plaintiff:        Randazza Legal Group
                                By:  MARC J. RANDAZZA
 3                                   Attorney at Law
                                     staff@randazza.com
 4                              4974 S. Rainbow Boulevard
                                Suite 100
 5                              Las Vegas, Nevada 89118

 6                              CA Goldberg PLLC
                                By:  CARRIE A. GOLDBERG
 7                                   Attorney at Law
                                     carrie@cagoldberglaw.com
 8                              16 Court Street
                                33rd Floor
 9                              Brooklyn, New York 11241

10                              Andrew B. Greenlee PA
                                By:  ANDREW B. GREENLEE
11                                   Attorney at Law
                                     andrew@andrewgreenleelaw.com
12                              401 East 1st Street
                                Suite 261
13                              Sanford, Florida 32772

14
      For the Defendant:        Office of the Attorney General
15                              State of Florida
                                By:  TIMOTHY L. NEWHALL
16                                   SARA E. SPEARS
                                     Attorneys at Law
17                                   timothy.newhall@myfloridalegal.com
                                     sara.spears@myflorida.com
18                              PL-01, The Capitol
                                Tallahassee, Florida 32399
19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2         (Call to Order of the Court at 1:09 PM on Thursday, May 02,

 3    2024.)

 4              THE COURT:  Please take your seats.

 5              All right.  We are here in Case No. 4:24cv140.  We are

 6    here for the preliminary injunction hearing.  I've got the

 7    plaintiff's motion for preliminary injunction, ECF No. 9; the

 8    response, ECF No. 28; and the reply, ECF No. 31.  There's, of

 9    course, various attachments, and I granted the amended request

10    for judicial notice, ECF No. 26.  I believe those are the papers

11    in front of me.

12              I've been told that the plaintiff intends to call two

13    witnesses; i.s that correct, Counsel?

14              MR. RANDAZZA:  That's correct, Your Honor.

15              THE COURT:  All right.  And at this time does the

16    defense intend on calling any witnesses?

17              MR. NEWHALL:  That's correct, Your Honor.

18              THE COURT:  Does not?

19              MR. NEWHALL:  We do not plan on calling any witnesses.

20              THE COURT:  Fair enough.

21              All right.  What we are going to do -- y'all have

22    already briefed the matter, so I'm going to have the plaintiffs

23    go ahead and call their witnesses.  After you call your

24    witnesses, I'm then going to have a series of questions for both

25    sides.  We'll then take a break.  And once you have answered my
```

```
 1   questions, we'll take a break.  You can take the time that you
 2   need -- and I'll ask you how much time you need to review your
 3   notes and ascertain how much time you need to make any
 4   additional argument.
 5          So let me find out.  I know we are going to hear from
 6   both Ms. Foy and Mr. Foy by Zoom.  In what order, Counsel, do
 7   you intend to call them?
 8          MR. RANDAZZA:  Your Honor, we'd like to call Ms. Foy
 9   first.
10          THE COURT:  Okay.  So, Ms. Foy, if you'll come on up
11   to the witness stand.
12      (Ms. Foy entered the witness stand.)
13          THE COURT:  I'm sorry.  Perhaps -- I had a cheat
14   sheet, but we'll get Scott's full name shortly.
15          Ma'am, if you'll raise your right hand, please.
16          TEENA FOY, PLAINTIFF'S WITNESS, DULY SWORN
17          THE COURT:  Please take your seats.
18          The black strip in front of you with the red light is
19   a microphone.  And I need you to pull all the way up to that so
20   we can hear you and the court reporter can --
21          THE WITNESS:  Okay.  I have no hearing in this
22   (indicating) ear, so I'll do my best to hear you.
23          THE COURT:  Very good.  I'm not going to be asking you
24   the questions, counsel will.  But do not hesitate, if you don't
25   hear something, to let us know.
```

```
 1                  THE WITNESS:  Thank you.

 2                  THE COURT:  Okay.  Counsel, you may proceed.

 3                         DIRECT EXAMINATION

 4    BY MR. RANDAZZA:

 5    Q.   Good afternoon, Ms. Foy.

 6    A.   Good afternoon.

 7    Q.   For the record, can you state your full name?

 8    A.   Teena G. Foy.

 9    Q.   And can you tell me your relationship to Scott Graham-Foy?

10    A.   He is my son.

11    Q.   Can you tell me -- tell me about Mr. Foy and your

12    relationship when he was a child.

13    A.   Yes.  I basically raised Scott on my own.  His father filed

14    for divorce and never offered any emotional or financial

15    assistance for Scott.  So it's basically been just Scott and I

16    for his whole life.

17    Q.   Would you say you've been an involved parent?

18    A.   Very much so.

19    Q.   Where did he attend school?

20    A.   He went to grammar school at Riverside Presbyterian.  It's

21    a private school in Jacksonville.  Then he attended Stanton

22    Preparatory School in Jacksonville, Florida.  He attended

23    college at FSU for two years.

24    Q.   And would you say that he had promise?

25    A.   He had what?
```

Direct Examination - Ms. Foy

```
 1    Q.    Promise?

 2    A.    Very much so, yes.

 3    Q.    When did you see that change?

 4    A.    He -- in 2000, he had orthognathic surgery.  In layman's

 5    terms what that is is they went in and broke his mandible,

 6    jawbone, cut pieces out of it, and reconnected it.  That's a

 7    very painful, painful surgery.  His physician prescribed opiates

 8    for the pain, and he became addicted to those drugs.

 9          When the doctor would no longer prescribe them, he sought

10    other avenues to get his drugs.

11    Q.    Illegal avenues?

12    A.    Yes.

13    Q.    So was that the start of his legal troubles?

14    A.    Yes.

15    Q.    Can you tell me a bit about your life with him while he was

16    under the throes of addiction.

17    A.    I was very frustrated at his behavior.  I knew when he was

18    high.

19          One event that occurred, I woke up in the middle of the

20    night and heard him -- he was in respiratory failure.  Had I not

21    come to his rescue -- I called rescue; they took him to the

22    hospital and basically pumped his stomach.  And they Baker Act'd

23    him, so he spent a couple of days in the hospital.

24    Q.    What was the danger to his health at that time?

25    A.    The danger was an overdose of opiates would have affected
```

Direct Examination – Ms. Foy

1   his respiratory system and shut it down, and he would have died.

2   Q.   And approximately how many years would you say he struggled

3   with this addiction?

4   A.   Probably from 2000 until the event in 2011.

5   Q.   What was your relationship like with him through those

6   11 years of addiction?

7   A.   Frustration.  I still loved him.  I tried to do everything

8   I could to help him, but people that are addicted don't realize

9   that they have a problem.  They don't realize the dangers.  All

10  they want is to satisfy that craving.

11  Q.   You said "the incident"?

12  A.   Yes.

13  Q.   You're referring --

14  A.   June -- June 11th, I believe, of 2011.

15       He was living with me.  We were walking down the hall.  I

16  was behind him, and I expressed my frustrations at his

17  addiction, his behavior.

18  Q.   How did you do that?

19  A.   Verbally.  I expressed to him, Scott, you're going to die

20  if this continues.  I love you.  I don't want that to happen.

21       The next thing is I took my hand and I slapped him in the

22  middle of his back.  The next occurrence was I was being hit

23  with a frying pan and cut with a kitchen knife.

24  Q.   So have you reviewed the government's opposition --

25  A.   I have.

Direct Examination – Ms. Foy

1   Q.    -- to the motion here?

2   A.    And some of it is fictitious.

3   Q.    You've reviewed the police report?

4   A.    I have.

5   Q.    Tell us in your own words what happened that night and

6   maybe help us see what you disagree with in that rendition of

7   facts, if anything.

8   A.    After that occurred, I went to the back room and I sat on

9   the floor.  He -- as in the report, he stuffed a cloth in my

10  mouth; that didn't occur.  He hit me with a hammer; that did not

11  occur.

12      In actuality, he started crying and he said, Why have I

13  done this to the person that loves me the most?  Mom, I'll take

14  you to the ER.  I was afraid.

15      So he left the room, went into the dining room.  I was in

16  my bedroom.  I walked out the front door and went to a

17  neighbor's house, and they called rescue, not the police

18  department.

19      They took me to the ER first at Mayo Clinic and they did a

20  CAT scan, but they don't treat trauma, so they transferred me to

21  Shands or downtown, and I spent the night.  I did not have

22  life-threatening injuries.

23  Q.    Up to that point, did he have any other family involved in

24  his life?

25  A.    No.

Direct Examination - Ms. Foy

1   Q.   So after that, how did he wind up being prosecuted?  Did

2   you report him to the police?

3   A.   No, I did not, no.  He went and stayed at a friend's house.

4   I didn't know where he was.  And I think she ultimately called

5   the police and he was arrested.

6   Q.   Did you testify against him at his trial?

7   A.   I did not.

8   Q.   Did he have a trial?

9   A.   No, he pled.

10  Q.   So were you at his sentencing?

11  A.   No.

12  Q.   Now, once he went to jail, did you stay in contact with

13  him?

14  A.   It took a year, and he reached out to me.  He wrote me a

15  letter stating his remorse, and I responded to that letter.  So

16  for a bit we corresponded by mail.  Then we moved to a phone

17  visit one to two times a week.

18  Q.   And --

19  A.   And after that I was allowed by wardens at probably three

20  or four institutions to have a special visit with Scott.

21  Initially, one time a month and then it moved to twice a month.

22  Q.   So you visited him as frequently as you could?

23  A.   I did.

24  Q.   Can you characterize those visits for me?

25  A.   Well, we both looked so forward to actually being able to

Direct Examination – Ms. Foy

1   sit across from one another and visit, talking about fun things,

2   serious things, where he was going in his future.

3       So it was -- it was cathartic for both of us.

4   Q.   I'm sorry.  What was the last word?

5   A.   Cathartic.

6   Q.   Cathartic.

7       Did any of the visits -- were they characterized by anger?

8   A.   Absolutely, no.

9   Q.   Did he ever express being upset with you?

10  A.   No.

11  Q.   Did you ever express being upset with him?

12  A.   In the letters originally we talked about the event and,

13  you know, how did this happen, but I was never really angry at

14  him.

15  Q.   You could not have been right pleased?

16  A.   Yeah.

17  Q.   Tell us about your progression from -- about your emotions,

18  from the incident to the visitations, toward him.

19  A.   At first I was very afraid, scared.  That progressed to

20  caring, deepening my love for Scott, and he for me.  The visits

21  went by so quickly.  It seems like I would just get there and

22  then it was time to leave.  And we both looked so forward to

23  those visits, being able to visually look at each other, share

24  thoughts.

25  Q.   Were you allowed physical contact?

1    A.    I could hug him and he would kiss me on the cheek good-bye,

2    yes.

3    Q.    Can you tell us about your health.

4          How old are you?

5    A.    77.  I'll be 78 in October.

6    Q.    Can you tell us about your health?

7    A.    In 2002, I had open heart surgery.  I had two bypasses.

8    The blockage was in the LED, layman's term, the widow-maker.  If

9    not caught in time, it's instant death for you.  That was

10   grafted.  Per my cardiologist, those graphs normally only are

11   patent, or last, for ten years.  It's been 22 years.

12         Now, will they blow?  Nobody knows.

13         In '23, I was diagnosed with clear cell renal carcinoma of

14   my left kidney.

15   Q.    Has any doctor given you a definitive amount of time to

16   live?

17              MR. NEWHALL:  Objection, Your Honor.  Hearsay.

18              THE COURT:  Overruled.

19              You can answer.

20   A.    Nobody can foresee what's going to happen.  When you have

21   carcinoma, your life expectancy is not many, many years.  With

22   heart disease, it's the same thing.  I have coronary artery

23   disease.

24              THE COURT:  Before you ask your next question, let me

25   clarify for the record.

1    Hearsay can be admissible in a preliminary injunction

2    hearing.  It depends on whether or not it's corroborated by

3    other evidence.  That's the *Levi Strauss* decision from the

4    Eleventh Circuit.  So if I allow hearsay in, then determine,

5    depending on what's all in the record, what weight, if any, I'm

6    going to give it.

7    So that was the explanation for my ruling; okay?

8    MR. NEWHALL:  Yes, Your Honor.

9  BY MR. RANDAZZA:

10  Q.  Do you have any fear of your son now?

11  A.  Absolutely none.

12  Q.  Can you elaborate on your confidence?

13  A.  He has been drug-free for 13 years.  While incarcerated, he

14  attended classes, anger management, substance abuse.  He has no

15  desire to ever return to that life.

16  Q.  Now, as you understand it, he is living freely in

17  Jacksonville now?

18  A.  Yes.

19  Q.  Is there any security outside your house?

20  A.  No.

21  Q.  What prevents him from visiting you now?

22  A.  His -- he knows that he's not supposed to, so he's abiding

23  by the rules.

24  Q.  Do you want to speak to him?

25  A.  Absolutely, yes.  I miss Scott.

Direct Examination – Ms. Foy

1    Q.    What kind of a relationship would you like with him?

2    A.    A loving relationship, being able to share in events in his

3    life, being able to go to where he lives, spend time, him being

4    allowed to come to my home and spend time with me.

5    Q.    Do you have any other family?

6    A.    No, I do not.

7    Q.    Do you understand why he can't see you?

8    A.    No.

9    Q.    Do you understand the government's position on why he can't

10   see you?

11   A.    I do not.

12   Q.    Do you have any knowledge of it at all?

13   A.    I cannot understand.  They protect victims's rights.  I

14   don't want to be a victim.  I want to be allowed to see my son.

15   I have no fear of any harm.

16   Q.    Did anyone ever ask you if you wanted to be classified as a

17   victim?

18   A.    No.

19   Q.    Have you ever had any opportunity to reject that status?

20   A.    I did speak to FCOR on the phone.  He was on the schedule

21   for conditional releases.

22   Q.    Yes.

23   A.    And you could listen in to the proceedings, and it went on

24   quite awhile.  They did the paroles first and then they moved to

25   the conditional.  And when they got to that agenda, they said

Direct Examination - Ms. Foy

1    they were going to take a break.  And that's when I said, Excuse

2    me, may I speak?  I think there is a recording of that

3    conversation.

4    Q.    What is your recollection of their response when you asked

5    to speak?

6    A.    They told me that the condition remained, that it was their

7    decision that it remained, that I could, I think, petition again

8    to have it removed.

9         And I asked them several times, Please review the letters

10   that I sent in, the two letters stating I wanted contact with my

11   son.

12   Q.    So as things stand, what are you deprived of because of

13   your victim status?

14   A.    I am deprived of spending the remainder of my life, how

15   long that may be, being able to visit my son.  That -- that

16   means everything to me.

17   Q.    Ma'am, aside from the emotional elements being with your

18   son, are there any practical considerations you'd like the Court

19   to know about?

20   A.    Yes, yes.

21   Q.    Can you describe them?

22   A.    Some of my doctors' appointments, I need assistance to get

23   there.  I have no one to take me.  I've had to take Uber because

24   after the procedure that they were doing, I could not drive.  If

25   I had contact with my son, he could assist me getting to my

Direct Examination – Ms. Foy

1    appointments.

2    Q.    Any other care that he could provide to you?

3    A.    Emotional support.

4    Q.    What about the other way around?  Do you have any care you

5    think you can provide him?

6    A.    Yes.  Being able to visit with your mother, the person that

7    loves you the most in the whole world, if he comes up with

8    having to make a decision about employment or education, I could

9    provide him with my thoughts on it.  As it stands right now, I

10   can't even text him.  I can't talk to him on the phone.  I can't

11   see him.  Absolutely no contact of any kind.

12   Q.    But you did have the ability to do that when he was in

13   prison?

14   A.    Absolutely.

15            MR. RANDAZZA:  I have no further questions for you.

16            Thank you.

17            THE WITNESS:  May I share pictures with the Court?

18            MR. RANDAZZA:  Your Honor, would that be --

19            THE COURT:  Certainly.

20            THE WITNESS:  This is a picture of Scott and I when he

21   was a baby.

22            THE COURT:  Thank you.

23            THE WITNESS:  This is a picture while he was

24   incarcerated.

25            THE COURT:  Thank you.

Direct Examination – Ms. Foy

```
1              THE WITNESS:  Here's another picture while he was

2    incarcerated.

3              THE COURT:  Thank you.

4              THE WITNESS:  And may I make a statement to you,

5    Your Honor?

6              THE COURT:  Hold on one second.

7              They really can only ask questions, ma'am.

8              But if you have something to ask her, like if she has

9    something she'd like to add...

10   BY MR. RANDAZZA:

11   Q.   Is there something you'd like to --

12   A.   Not to ask.  It's something --

13   Q.   No, to --

14   A.   I'd like to add.

15   Q.   -- add.

16             THE COURT:  Is there something you'd like to add?

17             THE WITNESS:  Yes.  Yes.

18             THE COURT:  He has to ask a question if you want to

19   respond to it.

20             THE WITNESS:  A statement from my heart.

21   BY MR. RANDAZZA:

22   Q.   Let me ask one question of you before that.

23   A.   Sure.

24   Q.   Do you -- you said that during the call they said that you

25   could repetition?
```

Direct Examination – Ms. Foy

```
 1   A.   (Witness nods head up and down.)

 2   Q.   Was it your understanding that hearing was about your

 3   rights or your son's rights?

 4   A.   My rights.

 5   Q.   Is there anything you'd like to add?

 6   A.   No.  Except the statement I would like to say.

 7            THE COURT:  So, yes, you want to add.

 8            And he's going to say, What would you like to tell the

 9   Judge --

10            THE WITNESS:  I'm sorry.

11            THE COURT:  -- and then you can tell the Judge; okay?

12   BY MR. RANDAZZA:

13   Q.   What would you like to tell the Judge?

14   A.   I would like to read a statement that comes from my heart,

15   please.

16            THE COURT:  Go ahead.

17            THE WITNESS:  Your Honor --

18            THE COURT:  Yes, ma'am.

19            THE WITNESS:  -- I don't want to fight, pick, or be

20   petty with whatever time I have left on this earth.  I just want

21   to live, love, and be loved, and be at peace.

22            THE COURT:  Thank you, ma'am.

23            MR. RANDAZZA:  Thank you.

24            He may have some questions.

25            THE WITNESS:  Okay.  Sure.
```

Cross-Examination – Ms. Foy

```
 1              THE COURT:  Counsel.
 2                      CROSS-EXAMINATION
 3   BY MR. NEWHALL:
 4   Q.    Good afternoon, Ms. Foy.
 5   A.    Hello, sir.
 6   Q.    We met earlier.  My name is Tim Newhall.  I work for the
 7   Attorney General's Office here in Florida.
 8         I have a very few questions for you.
 9   A.    Sure.
10   Q.    Let me ask you about your son's drug addiction beginning in
11   2000.
12         Was he eventually charged with a number of felonies for
13   procuring or attempting to procure narcotics?
14   A.    Yes.
15   Q.    And was he placed on probation in 2001?
16   A.    At one time, yes.
17   Q.    And he was placed on probation for five years, I believe;
18   correct?
19   A.    Yes, sir.
20   Q.    As a condition of that probation, was he directed to obtain
21   some sort of drug treatment?
22   A.    Yes, he was, and he did.
23   Q.    Okay.  And yet he relapsed into addiction; did he not?
24   A.    He did.
25   Q.    And his probation was violated after only a few months;
```

Cross-Examination - Ms. Foy

```
 1   correct?

 2   A.   Yes.

 3   Q.   And eventually he was convicted of over 20 third-degree

 4   felonies; was he not?

 5   A.   Yes.

 6   Q.   And was sentenced to two years in state prison?

 7   A.   Yes.

 8   Q.   Did he receive counseling or drug treatment while he was in

 9   prison?

10   A.   He did.

11   Q.   Did he receive any drug treatment or counseling after he

12   got out of prison?

13   A.   He did.

14   Q.   And again he relapsed into his addiction --

15   A.   Yes.

16   Q.   -- did he not?

17        You disagree with some of the language that's contained in

18   the police report; do you not?

19   A.   Yes.

20   Q.   Did you speak to the officer who responded?

21   A.   I did not.

22   Q.   Did you ever speak to any police officers concerning what

23   had happened?

24   A.   The police officer came into the emergency room and just --

25   they were giving me treatment.  But a long conversation with the
```

Cross-Examination - Ms. Foy

```
1    police, no.

2    Q.   Did you share any information with the police officer about

3    the assault on the night it occurred?

4    A.   I believe I did, yes.

5    Q.   Was your son charged with additional counts of obtaining or

6    attempting to obtain narcotics through fraud in 2007?

7    A.   Yes.

8    Q.   Did he plead guilty to those charges as well?

9    A.   Yes.

10   Q.   Did he receive any sort of counseling as a result of those

11   arrests?

12   A.   He did.

13   Q.   I'm sorry?

14   A.   Yes, he did.

15   Q.   Was he able to remain off of narcotics?

16   A.   Not until he was incarcerated in 2011.

17   Q.   Okay.  So would it be correct that your son had

18   court-ordered drug treatment on numerous occasions prior to

19   2011?

20   A.   Yes.

21   Q.   Is it correct to say that nothing helped him get over his

22   addiction?

23   A.   Not until 2011.

24   Q.   And your son has been out of prison since March 21st of

25   this year; correct?
```

Cross-Examination – Ms. Foy

```
1    A.    That's correct.

2    Q.    That's about six weeks?

3    A.    That's correct.

4    Q.    Are you currently taking any sort of prescription narcotic

5    medication?

6    A.    I am not, no.

7    Q.    Are you asking that your son be allowed to live with you so

8    that he could be your caretaker should that prove necessary?

9    A.    I don't necessarily want -- yes.  There's two answers to

10   that.

11         Yes, it would be nice for him to live with me, but he has

12   got a life of his own.  I just need his love and his support.

13   Q.    In the six weeks that your son has been out of prison, have

14   you written him any letters?

15   A.    I was not allowed to.

16   Q.    Is it your understanding that you are not allowed to have

17   contact with your son?

18   A.    Yes.

19   Q.    Or is it your understanding that your son is not allowed to

20   have contact with you?

21   A.    I don't know how to answer that.  It's -- it's -- it's

22   FCOR's un -- conditional release that he have no contact with me

23   of any shape, fashion, or form.

24   Q.    Has FCOR ever provided you anything in writing saying that

25   you are not allowed to have any contact with your son, even in
```

```
1   writing?

2   A.    No.

3           MR. NEWHALL:  I have no further questions, Your Honor.

4           Thank you.

5           THE COURT:  Thank you.

6           Redirect?

7                        REDIRECT EXAMINATION

8   BY MR. RANDAZZA:

9   Q.    Ms. Foy, have you ever seen --

10          MR. RANDAZZA:  Can I approach the witness with

11  Document 30-2 filed by the State?

12          THE COURT:  Certainly you may.

13  BY MR. RANDAZZA:

14  Q.    Ma'am, have you seen this document before?

15  A.    No.

16  Q.    If you look at that page that has the conditions on it, do

17  you see where it says:  *No contact with the victim*?

18  A.    Yes.

19  Q.    Can you tell me any other conditions on that page?

20  A.    Curfew, anger management program for Scott.

21  Q.    Okay.  Does it say anything after "anger management

22  program"?

23  A.    *No contact with victim.  Curfew* after that.  Comments:

24  *Habitual offender.*

25  Q.    Anything about drug treatment?
```

1    A.    Yes.

2    Q.    What?

3    A.    *Substance abuse therapy program if time permits.*

4    Q.    Does it say "if time permits" or any other qualifications

5    on no contact with the victim?

6    A.    Yes.  *Anger management if time permits.*  *Substance abuse if*

7    *time permits.*

8    Q.    Is it your intent if he lives with you to ensure that he

9    has drug treatment?

10    A.    Absolutely.

11    Q.    You will make time for it?

12    A.    I will.

13    Q.    What about anger management?

14    A.    It's not a question if time permits; it's absolutely

15    necessary.  The same for anger management.

16    Q.    Thank you.

17           MR. RANDAZZA:  I have no further questions.

18           THE COURT:  Thank you, ma'am.

19           You may step down.

20           THE WITNESS:  Thank you.

21       (Ms. Foy exited the witness stand.)

22           MR. GREENLEE:  Your Honor, we would like to call

23    Mr. Scott Graham-Foy.

24           THE COURT:  As I understand it, based on the protocol,

25    Ms. Foy is going to go to the witness room; correct?

```
1              MR. GREENLEE:  That's correct.

2              THE COURT:  All right.  Why don't we get everybody

3    settled first.

4              MR. GREENLEE:  The witness room is where?

5              THE COURT:  Right outside the door, across the hall,

6    and to the right and left of the double doors.

7          (Ms. Foy exited the courtroom.)

8          (Pause in proceedings.)

9          (Mr. Graham-Roy entered the Zoom conference.)

10             THE COURT:  And the mic is off.

11             THE WITNESS:  I'm here.

12             THE COURT:  There you go.

13             Good afternoon, Mr. Foy.  My name is Judge

14   Mark Walker.

15             Are you able to see in the courtroom?  There should be

16   a picture of the bench with me sitting, as well as a picture of

17   the well with a lawyer in a dark blue suit standing behind a

18   podium.

19             THE WITNESS:  Yes, Your Honor, I am.

20             THE COURT:  If you'll raise your right hand, sir.

21     SCOTT MICHAEL GRAHAM-FOY, PLAINTIFF'S WITNESS, DULY SWORN

22             THE COURT:  You can put your hand down.

23             If you'll state your name for the record, sir.

24             THE WITNESS:  Scott Michael Graham-Foy.

25             THE COURT:  All right.  The lawyers are going to now
```

Direct Examination – Mr. Graham-Foy

```
 1   ask you some questions.  If you don't hear something, please let
 2   them know and they'll repeat the question.  It's very important,
 3   especially since we are doing this by Zoom, that you keep your
 4   voice up and we not speak over one another.
 5           If you hear an objection, please wait for me to rule
 6   on the objection.  And, again, if you didn't hear something I
 7   said or one of the lawyers said, don't hesitate to let us know.
 8           Counsel, you may proceed.
 9           MR. GREENLEE:  Thank you, Your Honor.
10           And it's Andrew Greenlee, for the record.
11                       DIRECT EXAMINATION
12   BY MR. GREENLEE:
13   Q.   Good afternoon, Mr. Graham-Foy.
14   A.   Good afternoon, sir.
15   Q.   I'd like to ask you a couple of questions about your
16   childhood.
17           Who is it who raised you?
18   A.   My mother raised me, Teena Foy.
19   Q.   Did you have any other familial relationship during your
20   childhood?
21   A.   My grandparents, my maternal grandparents.
22   Q.   Okay.  Are they still with us?
23   A.   No, they are passed -- they passed away before 2000.
24   Q.   Could you repeat that?
25   A.   Yes.  They passed away before the year 2000.
```

Direct Examination – Mr. Graham-Foy

1  Q.   How would you describe your relationship with your mother

2  when you were growing up?

3  A.   Very close.  It was just my mom and I since I was 3 and a

4  half years old, so we were very, very close.  She was my sole

5  supporter and rock, you know, the person I turned to for

6  everything.

7  Q.   Did you trust her?

8  A.   Very much so.

9  Q.   Did you depend on her?

10  A.   Absolutely.

11  Q.   At some point did you undergo a surgery?

12  A.   I did.  Yes, sir.

13       In -- I was born with a severe overbite that caused me to

14  have debilitating headaches caused by a overbite, so I had

15  reconstructive jaw surgery in the year 2000.  They broke my jaw

16  in six places and realigned it.  I was in the hospital for three

17  days for that.

18  Q.   What medications were you prescribed for pain?

19  A.   Demerol, Morphine, all opiate painkillers.

20  Q.   Did those medications have any impact on your subsequent

21  life experiences?

22  A.   Yes, sir.  They catapulted me into a severe opiate

23  addiction.

24  Q.   I want to move to the incident that led to your

25  incarceration in 2011.

Direct Examination - Mr. Graham-Foy

```
1         Do you recall that night?
2    A.   Somewhat, yes, sir.  It's hazy, but I do recall it.
3    Q.   Were you intoxicated?
4    A.   I was.
5    Q.   Were you addicted to painkillers during that phase of your
6    life?
7    A.   Absolutely.
8    Q.   What do you recall about the circumstances that led to your
9    arrest?
10   A.   My mom and I got into an altercation that evening, early --
11   I think it was the early hours of the morning.  I was high.  I
12   was on opiates at the time, and she was fed up.  We got into an
13   altercation in the -- I think it was in the hallway, I believe,
14   at the time.  She hit me and the altercation turned violent.  I
15   grabbed some weapons and used them against her.
16        And --
17   Q.   Did --
18        (Indiscernible crosstalk.)
19   A.   Right after -- I'm sorry.  Go ahead.
20   BY MR. GREENLEE:
21   Q.   No, pardon me.  Go on.
22   A.   And almost immediately afterwards, after the incident, I
23   tried to help her because I realized how insane everything was
24   and how insane -- how -- the insanity my life had gotten to at
25   that point.
```

Direct Examination - Mr. Graham-Foy

```
 1   Q.   Did you shove gauze in her mouth?

 2   A.   No, I did not.

 3   Q.   Did you pace back and forth with a hammer?

 4   A.   No, I did not.

 5   Q.   Was it ever your intent to hit your mother with a hammer?

 6   A.   No, there was no hammer.

 7   Q.   Now, that incident led to your incarceration.

 8        Did it have any impact on your ability to break your

 9   addiction?

10   A.   Did the incident help me break my addiction?

11   Q.   Yes.

12   A.   Absolutely, absolutely.  Unequivocally.

13   Q.   Could you describe how that process played out?

14   A.   I hit rock bottom, sir.  That was the lowest point of my

15   life.  You know, I had hurt the person -- the only person that

16   had been there for me for my whole life.  You know, the person

17   that was my rock I had hurt.

18        And I -- I knew it was then or now or never for me to go

19   back up.  You know, if I didn't go back up, then I was going to

20   die.  I already overdosed once before.

21   Q.   When you overdosed before, who was it that saved you?

22   A.   She did.

23   Q.   Let's talk about your incarceration for a moment.

24        Are you okay?  Can we continue?

25   A.   I'm good.  Go ahead, sir.
```

Direct Examination - Mr. Graham-Foy

```
 1   Q.   I understand you have a disciplinary record.
 2        Could you describe the events that are in your disciplinary
 3   record?
 4   A.   I got in trouble for wearing a pair of shorts when I wasn't
 5   supposed to.
 6        I got in trouble for menacing with a fire extinguisher.
 7        I got into a couple of scuffles.  It's prison.  You know,
 8   I'm a white boy in prison, for lack of another -- so, you know,
 9   a couple of times we got into a couple of scuffles.
10        Got in trouble for getting copies of my water treatment
11   course that I was trying to complete to better myself.
12        And I think -- oh, I got in trouble for comforting one of
13   the people that I worked for.  She was having a bad day.
14   Q.   And what did you do?
15   A.   To her or you mean -- oh, I put my arm around her because
16   she was having -- I had gotten close to this employee, and she
17   was having a bad day with somebody -- with one of her family
18   members.  And I just forgot where I was and went and put my arm
19   around her to comfort her and another staff member saw it.
20   Q.   And that led to a disciplinary violation?
21   A.   Yes.
22   Q.   Did you ever receive a violation for a letter that was
23   sent?
24   A.   Oh, yes, sir.  Yes, sir.  A letter, yes, sir.
25   Q.   Can you describe what that was about?
```

Direct Examination – Mr. Graham-Foy

1    A.    It was basically a letter that was written to let somebody

2    know where I was and how I was doing.  It was nothing -- it was

3    considered to be a mail violation because the mail was handled

4    in an inappropriate manner.

5    Q.    So who was the letter -- my understanding is that you

6    received a letter; is that correct?

7    A.    No.  I believe it was a letter that was -- it was a letter

8    going out.  That was a long time ago, but it was a letter that

9    was going out.

10   Q.    Who was it to?

11   A.    To a friend of mine.

12   Q.    Okay.  Did you ever get cited for a letter that you

13   received from your mother?

14   A.    Mr. Greenlee, I don't recall.  I probably might have gotten

15   one from when I received one from my mom, but it's been so many

16   years.  I don't want to say one way or other.  I'm not sure.

17         I believe so, now that you say that, a letter to my mom to

18   let my mom know where I was and how I was doing.

19   Q.    To let your mom know where you were physically?

20   A.    Right, right.  Where I was, you know, how I was doing,

21   where I was at.

22   Q.    Okay.  Let's talk about your education.

23         Did you receive any courses while you were incarcerated?

24   A.    Yes, sir, I did.

25         I completed a -- the first education portion I did was to

Direct Examination – Mr. Graham-Foy

1   become an inmate teaching assistant so I could teach the
2   other -- the guys who don't have GEDs or couldn't -- some people
3   couldn't even read.  So I went through that certification to be
4   able to teach them.
5        And then I was trained as an inmate assistant for the
6   disabled and the inmates that were in wheelchairs or had
7   disabilities.  Because for the majority of time, if I wasn't in
8   education working, they had me working in the infirmary or with
9   inmates that could not take care of themselves.  You had a lot
10  that were incontinent.  Nobody wants to take care of those
11  people, so I was willing to help those people.
12  Q.   Would it be fair to characterize those people as
13  vulnerable?
14  A.   Yes, sir.
15  Q.   So you were charged with caring for vulnerable people while
16  you were incarcerated?
17  A.   Yes, sir.
18        And I also completed education getting my water and
19  wastewater treatment certifications.
20  Q.   What were your grades like in those courses?
21  A.   High, in the 90s.  I think the lowest was 88.
22  Q.   Now, we spoke a little bit about the violations that you
23  received.
24        Did they negatively impact your privileges while you were
25  incarcerated?

Direct Examination - Mr. Graham-Foy

```
1   A.   I mean, right at the time that you got them, yes, of
2   course.  Yeah, that's -- there's -- you know, they put you in
3   confinement or you lose privileges.
4   Q.   What about subsequently?  Did they negatively impact your
5   ability to obtain conditional release?
6   A.   No, sir, they did not.  In fact, I finished prison and work
7   release at community custody -- you know, in the community with
8   a job to help my transition back into the community.
9   Q.   Is that a privilege that is afforded to all inmates?
10  A.   Very few inmates get that privilege.
11  Q.   So what does that mean if you were able to receive that
12  privilege but other inmates were not?
13  A.   That I did -- was doing the right thing.  They only send
14  the people they know they can trust and can make it out there
15  and do -- the percentage of work release beds is very small.
16  There's like 100-something beds in Jacksonville where I'm from
17  and thousands that are trying to go.
18  Q.   Did you ever receive a mental health evaluation while you
19  were incarcerated?
20  A.   Yes, sir.
21  Q.   Tell me about that.
22  A.   When -- well, when mom would come visit me in prison, every
23  institution had to approve her to come visit.  So one of the
24  wardens at one of the institutions that I was at wanted me to
25  have a mental health evaluation with a psychologist to make sure
```

Direct Examination – Mr. Graham-Foy

1  that was appropriate and deem, you know, that it would be

2  beneficial and not a threat to the security of the institution

3  or any of the visitors.  So I did that at Hamilton Correctional

4  Institution.

5  Q.  And what were the results of the mental health evaluation,

6  if you know?

7  A.  They -- they let her visit.  They said that they

8  recommended highly that she -- that visitation was appropriate

9  and it was important.

10 Q.  Let's talk about those visitation -- the visitation that

11 you had with her.

12     Were you allowed to have any physical contact with her?

13 A.  Yes, sir.

14 Q.  Could you describe that?

15 A.  Sure.  You got a hug and a embrace at the beginning of each

16 visit.  And you sit across the table from each other and you can

17 hold hands.  You know, you can fix your food together and visit.

18 And then at the end when they are leaving, you can hug and kiss

19 them as they leave.

20 Q.  What did those visits mean to you?

21 A.  Everything.  Everything.  That was so very important to me.

22 She's all I have in this world.

23 Q.  Have you had any substance abuse treatment while you were

24 incarcerated?

25 A.  Yes, sir.  I completed intensive outpatient treatment

Direct Examination – Mr. Graham-Foy

1    through a provider that comes in and provides it for the

2    prison -- or for the Department of Corrections.  That was

3    integral in me being able to go to work release, but even beyond

4    that, just because I needed it.

5    Q.   Now, it's my understanding that there were other instances

6    where you received substance abuse treatment.

7         Was that effective in the prior iterations?

8    A.   What do you mean?  Was the treatment prior to that

9    effective?

10   Q.   Right.  I mean, did you have substance abuse programs that

11   you attended prior to 2011, when you were incarcerated this most

12   recent time?

13   A.   Yes.  Before I went to prison, yes, I did.  I had gone to

14   treatment before.

15   Q.   Now, what is the difference between those treatments that

16   apparently didn't work and this most recent treatment that

17   apparently did work?

18   A.   It gets to a point that it's self-realization and admitting

19   and understanding that this is it, that you have to -- you know,

20   the change has to happen.  And the biggest thing is when you get

21   to the point when they say you are sick and tired of being sick

22   and tired, when you are just tired -- and it had beaten me down

23   so far.  Like I said in the beginning, there is no lower that I

24   could have gone.

25   Q.   Let's talk about your current circumstances.

Direct Examination - Mr. Graham-Foy

```
 1        Where do you currently reside?
 2   A.   I live in Jacksonville, Florida, downtown.
 3   Q.   And who do you live with, if anyone?
 4   A.   Myself.  I live alone.
 5   Q.   Okay.  Where do you work?
 6   A.   I work for Goodwill Industries of North Florida and also a
 7   company called Diamond Student Information Systems out of
 8   California.
 9   Q.   Is that the backdrop for your Zoom?
10   A.   It is right now.
11   Q.   Okay.  What type of work do you perform for Goodwill?
12   A.   Goodwill, I work to help fund the programs.  So I work in
13   the technology department.  We list all the things that people
14   donate -- phones, tablets, computers, and stuff like that -- to
15   help to sell them on an auction site to get money to help the
16   programs that Goodwill funds.
17   Q.   And what about for Diamond?
18   A.   For Diamond I'm an account rep.  I sell a computer program
19   that runs career schools and retraining programs.
20   Q.   Do you have any other employment?
21   A.   No, sir, that's all.
22   Q.   Okay.  What would it mean to you if you were able to live
23   with your mother?
24   A.   It would mean everything.  You know, her mobility, I'm
25   sure, is getting worse and worse.  I haven't seen her since I
```

1    left prison, so I'm sure her mobility is getting worse and she's

2    not doing as well.  To be able to help her, it -- it's my

3    support system.  It's -- everything comes back from me as far as

4    that goes.

5        I can't even explain what it would mean.  It's just -- it's

6    all I ever think about right now.

7    Q.   Do you think it's more likely for you to recidivate or

8    commit other crimes if you were living with your mother?

9    A.   No.

10   Q.   Would it be less likely if you were living with her?

11   A.   Absolutely.

12   Q.   Would it be more likely for you to relapse into drug

13   addiction if you were living with your mother?

14   A.   No.

15   Q.   Would it be less likely?

16   A.   Less likely.

17   Q.   Would you ever try to hurt her if you were living with her?

18   A.   No, sir.

19   Q.   Are you capable of assisting her in connection with her

20   medical needs?

21   A.   Absolutely.  That's what I just did for almost the whole

22   time -- like I said, when I was in prison, that's all I did was

23   help people that were with mobility issues and with health care

24   issues.

25        (Discussion between the plaintiff's attorneys.)

Direct Examination - Mr. Graham-Foy

```
 1  BY MR. GREENLEE:
 2  Q.  Are there any other individuals who you are restricted from
 3  seeing or associated with?
 4  A.  Not that I know of.
 5  Q.  If I were to come visit you in Jacksonville, would that be
 6  a violation of the conditions of your conditional release?
 7  A.  If you were to come visit me?
 8  Q.  Correct.
 9  A.  No, sir.
10  Q.  What about any other member of the community, could they
11  come and visit you without violating your conditions?
12  A.  No, it wouldn't violate my conditions.
13  Q.  Just to be clear, I do understand that you're prohibited
14  from associating with felons?
15  A.  Oh, right, of course.
16  Q.  I mean law-abiding citizens.  Can any other law-abiding
17  citizen visit you without violating the conditions of your
18  conditional release?
19  A.  Yes, sir.
20          MR. GREENLEE:  That's all the questions we have.
21          Thank you.
22          THE COURT:  Thank you.
23          Cross-examination?
24
25
```

1                        CROSS-EXAMINATION

2    BY MR. NEWHALL:

3    Q.    Good afternoon, Mr. Graham-Foy.

4          Can you hear me okay?

5    A.    Yes, sir.

6    Q.    My name is Tim Newhall.  I work for the Attorney General's

7    Office, and I represent the Florida Commission on Offender

8    Review.  I have just a few questions for you.

9          If you don't understand a question that I ask, please let

10   me know and I'll rephrase it for you; okay?

11   A.    Okay.  Thank you.

12   Q.    You were addicted to prescription medication following this

13   surgery in 2000; correct?

14   A.    Yes, sir.

15   Q.    And by the end of 2000, you had been arrested and charged

16   with, I think, 26 counts of attempting to obtain or obtaining

17   controlled substances by fraud; is that -- is that right?

18   A.    Yes, sir.

19   Q.    Okay.  And were you placed on probation for a period of

20   five years as a result of that?

21   A.    Yes, sir.  I believe it was five years, yes, sir.

22   Q.    And as a condition of that probation, were you sentenced to

23   a residential treatment facility known as Phoenix House.

24   A.    I was, but they removed that condition.

25   Q.    So you never -- you never got that treatment?

Cross-Examination - Mr. Graham-Foy

```
1    A.    I never -- never got that treatment.
2    Q.    Did you receive any other treatment or counseling at that
3    time?
4    A.    No, sir.
5    Q.    Did you violate that probation within a matter of months?
6    A.    I'm trying to remember.  And they -- I believe -- did they
7    reinstate it?  I'm trying to remember.  It's a long time ago.
8          The -- you're correct, yes, sir.
9    Q.    Okay.  And do you recall that in 2001, you were actually
10   sentenced to two years in state prison for violating that
11   probation?
12   A.    Correct.  That's correct.  You are right.
13         I was placed on five years, violated, and they gave me the
14   two years followed by three years.  And that's when they removed
15   the Phoenix House thing, yes, sir.
16   Q.    Okay.  So up until the time you violated your probation,
17   you still had the condition of probation to attend the Phoenix
18   House?
19   A.    They were trying to get right there.  I was trying to get
20   there, yes, sir.
21   Q.    Okay.  I understand.
22         Did you receive drug counseling or treatment while you were
23   in prison?
24   A.    Not that time -- you talking about this time or that time?
25   Q.    No, I'm talking about from 2001.
```

Cross-Examination - Mr. Graham-Foy

```
1   A.   No, sir.

2   Q.   Okay.  Were you released from that incarceration in 2003?

3   A.   Correct, in April.

4   Q.   Okay.  And upon being released, did you receive any type of

5   drug treatment or counseling?

6   A.   No, sir.

7   Q.   Did you remain off of drugs for some period of time

8   after --

9   A.   For a little while.

10  Q.   I'm sorry.

11       After being released in April of 2003, were you able to

12  remain clean for a short period of time?

13  A.   Yes, sir.

14  Q.   Eventually you did relapse into your addiction?

15  A.   Yes, sir.

16  Q.   And were you charged with more counts of obtaining

17  controlled substances by fraud in 2007?

18  A.   Yes, sir, one count.

19  Q.   Did you receive any sort of drug treatment or counseling

20  following that?

21  A.   I did get treatment.  They gave me Matrix House treatment

22  after that.

23  Q.   Okay.  Were you able to remain clean for some period of

24  time?

25  A.   Yes, sir.
```

1    Q.   But you relapsed again following that 2007 arrest and drug

2    treatment; correct?

3    A.   Yes, sir.

4    Q.   Okay.  And that's what led up to the event in 2011 that you

5    were describing to Mr. Greenlee; correct?

6    A.   Yes, sir.

7    Q.   Okay.  When you were sentenced to prison in 2011, were you

8    sentenced as a habitual felony offender?

9    A.   I was.

10   Q.   Over the past 24 years have you had any success in

11   remaining off of drugs when you were not incarcerated or

12   otherwise under supervision?

13   A.   Yes, sir, I have.  I've been doing well.

14       You know, as far as -- when I went through my treatment,

15   you know, went through this last treatment, you know -- I've

16   been in the community now almost -- you know, it's work release

17   in the community.  I was out, as far as that goes.  And I've

18   been able to stay drug-free.

19       Something has just changed.  I can't explain it, you know,

20   as far as what goes -- if you are not an addict, I guess you

21   don't quite fully understand it.  There's a point when you get

22   so sick and tired of what's going on and you know there's no

23   other way, but -- you know, it's either better or death at that

24   point, you know.

25   Q.   You were released from custody on March 21st of this year;

1    is that correct?

2    A.    Correct.

3    Q.    So it's been about six weeks to date; is that correct?

4    A.    I believe so, yes, sir.

5            THE COURT:  Counsel, if you could ask, rather than me

6    doing it under Rule 614 -- I am interested to know how long he

7    was out on work release.

8            MR. NEWHALL:  Yeah.

9    BY MR. NEWHALL:

10   Q.    How long were you out on work release, Mr. Foy, that you

11   described?

12   A.    I went to work release in September, so it's been since

13   September --

14   Q.    Of 2023?

15   A.    -- until now.

16         Yes, sir.

17   Q.    You mentioned to Mr. Greenlee that -- you know, what you

18   thought about where you might be more or less likely to relapse

19   into drug abuse.

20         Do you acknowledge that there is a possibility that you

21   will relapse into drug abuse?

22   A.    I would love to say no, you know, no, but there's always

23   that possibility, yes, sir.  I can't -- I can't honestly say --

24   you know, answer that and say, you know -- but, no, I have no

25   intention of relapsing.

1    Either way it goes, I have no intention on relapsing.  But,
2  you know, I have to be honest and answer the question.
3  Q.   Only time will tell if this time you are able to finally
4  kick the habit?
5  A.   Yes, sir.
6  Q.   I don't have any further questions for you, Mr. Graham-Foy.
7  I wish you good luck.  Thank you.
8  A.   Thank you.
9         THE COURT:  Any redirect?
10         MR. GREENLEE:  Briefly, Your Honor.
11                 REDIRECT EXAMINATION
12  BY MR. GREENLEE:
13  Q.   Mr. Graham-Foy, when was the last time you used opiates?
14  A.   The last time that I used opiates would have been 2011.
15  Q.   So once you hit rock bottom, you quit; correct?
16  A.   Right.  Correct.  I mean -- and it's not like it's not
17  readily available in prison.  It's there.  It's no different
18  there than it is on the street.
19  Q.   Do you have any desire to use?
20  A.   No, sir.  That's taken too much from me and my life
21  already.  I'm not willing to give away anything else to drugs.
22         MR. GREENLEE:  No further questions, Your Honor.
23         THE COURT:  All right.  Thank you, sir.  We are going
24  to terminate the Zoom.
25         I wish you the best.  Thank you.

1          THE WITNESS:  Thank you, Your Honor.

2     (Mr. Graham-Foy exited the Zoom conference.)

3     (Ms. Foy entered the courtroom.)

4          THE COURT:  Any other exhibits or witnesses from the

5     plaintiffs?

6          MR. GREENLEE:  None from the plaintiff, Your Honor.

7          My co-counsel is retrieving --

8          THE COURT:  Hold on a second.

9          Anything additional by way of evidence or testimony

10    from the defense?

11         MR. GREENLEE:  Actually, my co-counsel reminded me

12    that we did, if it pleases the Court, want to play the FCOR

13    conditional release hearing.  It's a five-minute recording.

14         THE COURT:  Anybody wish to be heard?

15         MR. NEWHALL:  Your Honor, I don't have any objection.

16         THE COURT:  It's authentic?

17         MR. NEWHALL:  It was recorded, and we provided it to

18    them.

19         THE COURT:  Fair enough.

20         We are going to mark it as an exhibit so it's in

21    evidence.

22         MR. GREENLEE:  We can, Your Honor.

23         THE COURT:  All right.  That will be

24    Plaintiff's Exhibit 1 without objection.

25    (PLAINTIFF'S EXHIBIT 1:  Received in evidence.)

1          THE COURT:  Let me make plain, since it is an exhibit

2    and it's being played, the court reporter is not going to record

3    the tape.  We'll listen to it, and what's said on the tape is

4    what we hear and that is the evidence; okay?

5          MR. GREENLEE:  Thank you very much.

6       (Plaintiff's Exhibit 1 played.)

7          THE COURT:  Anything additional?

8          MR. RANDAZZA:  Nothing else from the plaintiff,

9    Your Honor.

10          THE COURT:  Anything from the defense?

11          MR. NEWHALL:  No, Your Honor, other than the filings

12    that we've already made with the Court.

13          THE COURT:  Certainly.

14          Here's what we are going to do.

15          MR. RANDAZZA:  Your Honor, may we recall Ms. Foy just

16    to discuss that hearing?

17          THE COURT:  Certainly.

18       (Ms. Foy entered the witness stand.)

19          THE COURT:  Ma'am, you are still under oath.  If

20    you'll take your seat.

21                         REDIRECT EXAMINATION

22    BY MR. RANDAZZA:

23    Q.   Ms. Foy, were you in the courtroom for that whole

24    recording?

25    A.   Yes.

Redirect Examination – Ms. Foy

1    Q.    Was that your voice on the recording?

2    A.    Yes.

3    Q.    Was that the only time you were ever able to address the

4    criminal justice system in whole?

5    A.    Yes.

6    Q.    Was it your understanding that hearing was about your

7    rights or your son's rights?

8    A.    My rights.

9    Q.    Did you feel that you were heard in that hearing?

10   A.    No.

11   Q.    Were you provided written notice of that hearing?

12   A.    No, I had to look it up myself.

13   Q.    Do you have any other thoughts about that hearing?

14   A.    Yes.

15   Q.    Would you like to share them?

16   A.    Yes.  The Commission sentenced my family to no longer

17   exist.

18              MR. RANDAZZA:  I have no further questions.

19              THE COURT:  Counsel, any cross?

20              MR. NEWHALL:  No cross, Your Honor.

21              THE COURT:  Thank you, Ms. Foy.

22              You may step down.

23         (Ms. Foy exited the witness stand.)

24              THE COURT:  Anything additional from plaintiff?

25              MR. RANDAZZA:  Nothing more, Your Honor.

1              Thank you.

2              MR. NEWHALL:  Nothing, Your Honor.

3              THE COURT:  What we are going to do is take a break

4    for the benefit of the court reporter because it's been about an

5    hour and a half.  When we come back, I'm going to have some

6    questions for y'all.  Once my questions are answered, we'll then

7    take a break so you can consider what, if any, additional

8    argument you wish to make in addition to your written arguments.

9              I thank you for your patience.  I'll see everybody

10   back in about ten minutes.

11             Thank you.

12        (Recess taken at 2:22 PM.)

13        (Resumed at 2:35 PM.)

14             THE COURT:  Y'all take your seats.

15             We'll get started as soon as we get everybody back.

16        (Pause in proceedings.)

17        (Resumed at 2:36 PM.)

18             THE COURT:  We are back on the record.

19             I have some -- y'all keep your seats.  I have some

20   questions.

21             First, just as a practical matter -- and I want to

22   make plain, some of my questions do not suggest that it's

23   determinative of anything.  I just want to make sure I have the

24   context and some background.

25             So let me ask, when I reviewed the conditional release

1  program, administrative rules and so forth, it appears to me

2  that there doesn't appear to be any prescribed right of review

3  for conditions imposed by the Commission, but there is a clause

4  that suggests that review must occur before a panel of two and

5  there's a preference that it be the same two that set the

6  original conditions of release.

7          I just want to make sure I understand -- again, not

8  suggesting it's determinative of the issue, but I want to make

9  sure I understand the process and the rules.

10          MR. NEWHALL:  Your Honor, Tim Newhall.

11          I believe you are correct.  That's my interpretation

12  of the administrative rules.  I'm not much more experienced in

13  these matters than Your Honor is.

14          THE COURT:  All right.  And let me hear from the

15  plaintiff.

16          Does the plaintiff believe that the language from the

17  rules themselves indicate that there is no right to review, but

18  if the conditions are reviewed, it has to be done by two and the

19  preference is the two that set the original conditions?

20          Is that as much as we know and as much as the record

21  reveals about the administrative rules?

22          I, of course, can take judicial notice of laws or

23  administrative rules or regulations.

24          MR. RANDAZZA:  Your Honor, it's my understanding that

25  Mr. Graham-Foy has that right, but there is no right afforded to

1    Ms. Foy.  And that is -- I will defer to my friend --

2            THE COURT:  And --

3            MR. RANDAZZA:  -- and the Judge in how it would

4    function.

5            THE COURT:  And does the --

6            MR. NEWHALL:  That's correct, Your Honor.

7            My answer just assumed that it was Mr. Graham-Foy's

8    right and not Ms. Foy's right.

9            THE COURT:  I also wanted to ask, I do not believe

10   there is anything in the record -- I think the record is silent.

11   So, one, is it silent?  But if not, what is there that suggests

12   whether or not Mr. Graham-Foy has or has not sought a review of

13   that condition?

14           Do we know?

15           MR. RANDAZZA:  Yes, he did, Your Honor.  In fact, it

16   was granted; however, the government intervened and had that

17   reversed.

18           THE COURT:  But that was a request that was made not

19   before the Commission.  Wasn't that the request that was made to

20   a -- the judge and the judge said yes, and then it was

21   ascertained the judge didn't have the authority because this is

22   not probation, but it's a conditional release program?

23           I thought that's what the record reflected, but I

24   could have that wrong.

25           MR. NEWHALL:  That is correct, Your Honor.

1          MR. RANDAZZA:  That sounds right.

2          THE COURT:  Okay.  So he sought a review through the

3     court system, and, quite frankly, I understand why.  Quite

4     frankly, if you ask ten lawyers on the street here in

5     Tallahassee, Is there a difference between conditional release

6     and probation? they probably wouldn't know that.  So I just want

7     to make plain I don't think that's odd.

8          So let me then turn -- other than that set of facts,

9     which I'm clearly familiar with, where Mr. Graham-Foy went to

10    the Court, the Court said yes, but then it was determined they

11    had no right -- that is, the judge had no right to do that

12    because it wasn't a condition of his release; it was a

13    conditional release program that was governed by the Board, do

14    we know whether or not Mr. Graham-Foy has sought review from the

15    commissioners?

16         MR. GREENLEE:  Your Honor, Andrew Greenlee here for

17    the plaintiff.

18         Ms. Graham-Foy sought additional review -- and,

19    Counsel, correct me if I'm wrong.  There was an appeal that was

20    taken -- that took place on, I believe, January 31st, and the

21    Commission denied.  They set it again on the docket, the FCOR

22    docket, and the Commission denied that request.

23         THE COURT:  Denied Ms. Foy's request?

24         MR. GREENLEE:  Ms. Foy's request.

25         As a victim, victims are afforded rights under, you

1   know, the Florida Constitution.  Ms. Foy asked them to

2   reconsider that decision.  And that request was denied.

3              THE COURT:  Was that done in writing or what that --

4   and I don't believe that's in the record, though, is it?

5              MR. NEWHALL:  Your Honor, there were several

6   handwritten letters that Ms. Foy submitted and they are in the

7   record.  And there was also -- I believe in the record there is

8   an email from someone who -- I guess with FCOR, who is in the

9   role of maybe a victim advocate, who asked if the -- because

10  this initial determination was made on January 24th -- asked if

11  the Commission would revisit the special condition of no victim

12  contact.

13             That was revisited on January 31st, and it was denied

14  again.  The condition remained in place.

15             THE COURT:  But all we know is it was denied.  It's

16  not like they sent a letter saying, This is denied, and why and

17  so forth.  I don't recall seeing that.

18             I'm not saying they had to.  I'm just saying I don't

19  see that.

20             MR. NEWHALL:  Your Honor, I think Your Honor is

21  correct.  There is a document that reflects that it was denied

22  on January 31st.

23             THE COURT:  All right.  What I did not see in the

24  record -- and y'all can tell me if I'm wrong -- this is --

25  because I want to be fair to everybody, both sides, and make

1    sure I understand what did or did not happen to the extent it's

2    relevant ultimately to what I've got to decide.

3        But this is not a case where determination is made and

4    then there's a new submission that's made to the commissioners

5    that says, whether it's by Ms. Foy or Mr. Graham-Foy, It's not

6    just that I just got released.  I've been on work release for

7    six months.  I've now been on conditional release for an

8    additional two months.  I was evaluated for drug treatment as

9    part of one of the "if time permits" requirements, and it's been

10   determined that no further inpatient or outpatient treatment is

11   necessary based on that evaluation.  And in light of this

12   additional information and the clarifications, we'd ask that the

13   commissioner -- the two commissioners that originally made this

14   decision revisit that decision in light of this new information

15   and supplemental information.

16        As I understood it, what happened was it was the

17   letters, consistent with the Plaintiff's Exhibit 1 that I heard

18   earlier, the exchange, which is, I'm not fearful of my son and I

19   want my son to help me, which was a reiteration of what had been

20   told to them at the Commission.

21        Do I have that wrong?

22        MR. RANDAZZA:  Your Honor, I actually have a recording

23   of the second hearing.  I could -- it's on my phone.  I could

24   play it into the microphone.

25        THE COURT:  But it's not in the record, and we can fix

1   that if we need to.

2           I'm trying to get a baseline of information.  Again, I

3   don't necessarily think it's determinative of any of the claims

4   in front of me, but I just want to know how this is supposed to

5   work and what was done so far.

6           So if I misapprehend what was done so far --

7           MR. RANDAZZA:  Right.

8           THE COURT:  -- you can tell me.  And if I need to --

9   somebody needs to supplement something, they can.

10          MR. RANDAZZA:  I can tell you the transcript of the

11  hearing is:  *The question is whether to modify Condition 33, no*

12  *contact with the victim.  I've reviewed this and the answer is*

13  *no.  My vote is also to deny that request.*

14          That's the hearing.

15          THE COURT:  So this was not -- but we do have the

16  letters in front of us, which I believe counsel has already

17  referenced; correct?

18          MR. NEWHALL:  Correct, Your Honor.

19          THE COURT:  I just want to make sure I've got the

20  baseline of information correct.

21          What was communicated in those letters?

22          MR. NEWHALL:  What was communicated in the letters was

23  pretty much what you heard Ms. Foy testified to today, what she

24  testified, what she said in the recording, the five-minute

25  recording, that was played earlier.

1          THE COURT:  So my summary -- and it's okay if I'm

2   wrong; I'm asking because I want to make sure that I'm right --

3   is that the reconsideration was essentially, I want to reassert

4   what I've told you within a couple of weeks of your original

5   determination and ask that you think about it again,

6   essentially; correct?

7          MR. NEWHALL:  Correct, Your Honor.

8          THE COURT:  Okay.

9          MR. GREENLEE:  Your Honor -- sorry.  Andrew Greenlee.

10          I believe the letter was -- was a little bit more like

11   what you asked about.  I think that she said he was out on

12   conditional release -- excuse me -- on work release.  She says

13   here he was assisting with instruction, education for inmates

14   getting their GEDs.

15          It says --

16          THE COURT:  So you think it's more consistent with

17   what we heard, which was in addition to what was submitted

18   initially?

19          MR. GREENLEE:  It was in addition to that.

20          She said here he has a course in substance abuse.  He

21   worked in the infirmary, with medical, helping inmates.  It was

22   in addition.  She tried to provide additional context.

23          So if Your Honor is --

24          THE COURT:  And those letters are in the record?

25          MR. GREENLEE:  Yes, Your Honor.  It's Document 36, I

```
 1  believe.
 2           MR. RANDAZZA:  30-6.
 3           MR. GREENLEE:  30-6.
 4           THE COURT:  I stand corrected.
 5           So as y'all are well aware, we set this hearing -- and
 6  I've been trying to read things and things were being sent to me
 7  and I've -- I can tell you I read and got reviews and summaries
 8  of documents, and I was doing my best to make sure that I was
 9  prepared.  And, hopefully, some of my questions so far and
10  moving forward will reflect that I did review everything, but I
11  wanted to make sure I didn't misapprehend what was in the
12  letters.  And to the extent it's relevant, I'll go back and
13  rereview them, since the simple notes that I took were more
14  limited as it relates to outlining the contents of those
15  letters.
16           All right.  I believe I understand who's done what so
17  far.
18           I think I also have this right, that there's three
19  commissioners, which is why you've got to have two voting
20  because you'd have to have a majority and that's why everything
21  is done in at least pairs of two.  Because if two agree on
22  something, there is no need to have a third person vote; is that
23  correct?
24           MR. NEWHALL:  That's correct, Your Honor.
25           THE COURT:  I want to ask some questions that relate
```

1    to standing and redressability to the plaintiffs.

2           If at least two people -- two of the commissioners

3    have to vote on something, and if the two commissioners that

4    voted on this are the people that were -- the preference is for

5    them to revisit something -- I understand if they issue a court

6    order, we are not asking them to reconsider it and we are

7    directing them to do something.

8           But help me to understand how is an order directing

9    one member of a three-person commission to do something going to

10   satisfy that prong of standing that we -- for shorthand, I'm

11   going to refer to as redressability?

12          MR. RANDAZZA:  Your Honor, on this --

13          THE COURT:  And I want to make plain and I want

14   Ms. Foy to understand, I know people get very frustrated when we

15   spend huge amounts of time on standing, but even if it's not

16   raised by the parties, I have a requirement as a judge.  I have

17   to go through it.

18          And I also want you to understand and make plain for

19   the record that case or controversy, which is what standing is

20   about, has morphed into something far beyond what it ever was

21   intended to be, I believe, or what was ever the law in the

22   circuit.  But I have to go through the standing analysis to

23   ensure there is jurisdiction, which I agree certainly with that,

24   but I also have to follow the law of this circuit.

25          And so simply saying, Well, it's obvious that Ms. Foy

1    has a real beef with something the commissioners did and the

2    commissioners have authority over this, boom, case or

3    controversy, a layperson would say, Of course there is.  This is

4    not just somebody who is interested in the state of affairs as

5    it relates to the Commission and seeks some sort of advisory

6    review about what they are doing.  But that's not what case or

7    controversy is under the law of this circuit, and, quite

8    frankly, wasn't before.  It's become a tougher standard now.  I

9    don't want to suggest that it was always that limited, because

10   it wasn't, but certainly we have more hoops to jump through.

11          I just -- for the life of me, I don't understand

12   how -- it seems to me, Counsel -- and you can explain to me why

13   I wouldn't -- that I would get reversed faster than I could say

14   "Eleventh Circuit" if I found suing one of three commissioners

15   would satisfy redressability under the law of this circuit.

16          And a related question is I don't understand how the

17   Commission -- the board itself is a proper party.  Under

18   *Ex Parte Young*, it seems to me what you have to do is sue each

19   individual member in their official capacity, whether it's the

20   school board, whether it's the Board of Governors, whatever

21   group it has to be.  The proper party for standing purposes in

22   redressability is you have to sue the individual members of

23   whatever entity you are talking about in their official

24   capacity.  You cannot sue the entity itself because of the legal

25   fiction of *Ex Parte Young* that we are really not suing the

1    State; we are just telling state actors, Follow the law.  You

2    are violating the Constitution.  Follow the law.

3           What part of that do I have wrong?  Start there, that

4    you can't sue the board; you have to sue the commissioner in

5    their official capacity.

6           And then go to the secondary question, which I started

7    with, which is, why don't you have to have all three members of

8    the board?

9           MR. RANDAZZA:  Your Honor, normally it is our

10   understanding you sue the chair of the board in order to effect

11   change in the board.  I will concede that it would have been

12   more proper to sue all three members of the board.  I cannot

13   dispute that.

14          THE COURT:  Do you agree -- so you've answered my

15   first -- second part of the question first, and that's fine,

16   which is, Judge, we believe that you can sue the chairman of the

17   board.  You don't have to sue all the board members.  And it's

18   up to me to decide what the law says --

19          MR. RANDAZZA:  Right.

20          THE COURT:  -- and we'll deal with that.

21          Do you agree with the other question I asked that

22   under well-established law applying *Ex Parte Young*, the board is

23   not the proper party --

24          MR. RANDAZZA:  Yes.

25          THE COURT:  -- as an entity as opposed to the

1    individuals?

2            MR. RANDAZZA:  Yes.

3            THE COURT:  All right.  So then the question becomes

4    is it necessary to have standing for purpose of redressability

5    to sue more than just the chairman?  And, Judge, we respectfully

6    believe we think that's enough.

7            And that's one question in front of me; correct?

8            MR. RANDAZZA:  Yes.

9            THE COURT:  Do you have any case that you can point to

10   that suing the chairman as opposed to the entire -- in their

11   official capacity as opposed to the entire board is enough under

12   the law of this circuit for standing?

13           MR. RANDAZZA:  Your Honor, I've not prepared one that

14   addresses that exact scenario.

15           THE COURT:  Okay.  Let me then turn to the second

16   issue.  You refer to Rule of Civil Procedure 25(c) -- and let me

17   make plain to you that I'm -- kudos to you for doing your best

18   to answer my question.  I understand why you did it, so this is

19   not meant to disparage or in any way be negative.  So I

20   understand why you tried to get -- give me the best answer you

21   could.  That's what lawyers do.

22           And as I explained to my child who is a new lawyer

23   recently, Just because there's not a good answer to give your

24   boss doesn't mean you say there is no answer.  You come up with

25   the best explanation and they can choose whether or not they can

 1   make the argument or not, the senior partner you are writing to.

 2        So I understand.  And we do that, and that's what good

 3   lawyers do.  So thank you for that.

 4        MR. RANDAZZA:  Yes.

 5        THE COURT:  My understanding of the Federal Rule of

 6   Civil Procedure 25 -- and it's used all the time in my court,

 7   because, for better of worse, I get a ton of injunctions and

 8   other actions.  We replace folks like the head of DOC, the head

 9   of the Agency for Health Care Administration.  That happens all

10   the time given the many folks that are in government in Florida.

11        And what Rule 25 says is you don't stop the lawsuit

12   and refile the whole lawsuit.  If you are suing somebody in

13   their official capacity and they are replaced, Rule 25 is the

14   mechanism by which the Court would substitute the new correct

15   head of DOC, or the new head of AHCA, or whoever is being sued

16   and asked to be sued.

17        I'm not aware of any case where Rule 25 has been used

18   or has been permitted to be used to do what you are asking,

19   which is, I sued one party and I want to join two other parties

20   in.  And, again, I understand you are saying, Judge, I'm giving

21   you what I got, but I just want to make sure I'm not missing

22   anything.

23        Is there any case law that you've got that says

24   Rule 25 can be used for that purpose, because I'm not aware of

25   any?

```
 1              MR. RANDAZZA:  In that specific context, no.  We
 2    have -- we weren't able to find anywhere -- it wasn't simply a
 3    substitution of party.
 4              And if it -- I can see the logical concern about
 5    substitution of two parties, but we'll take the vice chair and
 6    you can have an injunction against two of them.  I don't see
 7    anything in the language of Rule 25 that would limit
 8    Your Honor's discretion from changing that name to a
 9    commissioner's name at this time.
10              THE COURT:  But doesn't the rule itself contemplate --
11    I think I'm quoting from it -- "if an interest is transferred"?
12    I mean, isn't that the operative phrase?  That's why I get back
13    to how I think it's typically used.
14              If Mark Walker is the Secretary of DOC, and he's
15    replaced by Nicholas Shamberger during the pendency of the
16    lawsuit and the proper person to sue was Secretary Mark Walker,
17    the head of DOC, isn't Rule 25 used to substitute in Nicholas
18    Shamberger for Secretary Mark Walker because we have a new
19    Secretary and the proper party is the Secretary?
20              Isn't it the interest, quote/unquote, is being
21    transferred from one party to the other as it relates to -- and
22    it can be used in other instances?  I'm not suggesting that's
23    the sole use for Rule 25.  But isn't it you don't have to
24    restart your lawsuit because one person is being replaced by
25    another?  And I'm giving the most common example, but I
```

1    understand the transfer of interest can be used in other

2    contexts.

3              MR. RANDAZZA:  That is the most common use of it,

4    Your Honor.

5              I do see a -- I do see room in the language to do what

6    we are asking here; however, I also do not see any futility even

7    if the injunction were only entered against the chair.  I do not

8    see futility there.  The chair certainly has authority and

9    control over the board.  Perhaps their two subordinates would --

10             THE COURT:  But I direct them to the chair, so I issue

11   an injunction telling the chair to remove the condition of

12   supervision.  And the chair's response is, Well, I'll vote for

13   that, but only -- it takes two to remove a condition.

14             So I'm honoring the Judge's order.

15             MR. RANDAZZA:  Yep.

16             THE COURT:  I'm voting to remove it.  So she's done

17   what I've ordered her to do, and I've exercised control over

18   her.

19             MR. RANDAZZA:  Yes.

20             THE COURT:  How in the world is there going to be

21   redressability if neither of the other people has to vote?

22             Let's assume it doesn't matter that the preference is

23   to have the same two people revisit it.  I'm not necessarily

24   sure that's determinative.  But how does that work if I'm

25   ordering one person to vote on something and it takes two people

```
 1   to do it?
 2           MR. RANDAZZA:  If you enter that order with clarity of
 3   the constitutional violations, now the other two have to clearly
 4   violate the Constitution, as explained by Your Honor.
 5           The other option we have, of course, is we do have the
 6   right to amend as of right.  I don't think that we need a whole
 7   new hearing to do that, but if -- if that is everybody's
 8   preference.
 9           THE COURT:  Well, there's not a motion to dismiss now;
10   correct?
11           MR. RANDAZZA:  Correct.
12           THE COURT:  So you can certainly amend and add two
13   other folks.  I'm not suggesting that's -- and let me make
14   plain, I'm not suggesting that the Eleventh Circuit would say
15   that I enter an order conditioned on somebody amending the
16   complaint and fixing an error.  That doesn't necessarily work
17   either, but certainly you have the ability to join two
18   additional parties.
19           Whether or not you can then move again for a
20   preliminary injunction, there is case law that talks about under
21   what circumstances you can or cannot do that, and I'll leave
22   that to you.  And if you do a search with my name on it on
23   Westlaw, I'm pretty sure you can find an order that talks about
24   when that can be done, because there have been amended
25   complaints that have come before me on second motions for
```

```
 1   preliminary injunction.  So that may just be a good starting
 2   point.
 3            But you answered my questions in that regard.
 4            Let me turn to counsel for the defense.  As I
 5   understand it, and counsel for the plaintiff has agreed, under
 6   the narrow Ex Parte Young exception, you don't sue the entity.
 7   You would have to sue folks in their official capacity because,
 8   again, we go through the fiction that you are not suing the
 9   State; you are suing individuals, telling them to abide by the
10   Constitution.
11            And so under that narrow exception, though, there will
12   also -- there would be, since she's one of three commissioners,
13   the chairperson would have some relation to the process because
14   she's one of the three voting members.  So as it relates to Ex
15   Parte Young, I'm less concerned about that and I'm more
16   concerned about standing.
17            And do I misapprehend the defense's argument that,
18   Judge, even if you ordered the chairperson to do it, there would
19   be -- that does not redress the wrong they're seeking and,
20   therefore, there would be no standing?
21            Do I misapprehend your argument?
22            MR. NEWHALL:  No, Your Honor, that's correct.
23            The two commissioners who have not been sued were the
24   two that actually imposed the condition on Mr. Graham-Foy.
25            Now, the statute, 947, by which these commissioners
```

```
1    are appointed, each of three is separately appointed by the
2    Governor and approved by the State Senate, I believe, and they
3    all have the same obligation to follow the law.  If the two
4    commissioners who did not -- or the two commissioners who did
5    handle Mr. Graham-Foy's case were not enjoined, they -- what
6    they -- would say, We were following the law.  We are doing what
7    we are supposed to do.
8              THE COURT:  We are following the state law --
9              MR. NEWHALL:  Right.
10             THE COURT:  -- and nobody has told us that we have to
11   do anything else?
12             MR. NEWHALL:  Correct.
13             THE COURT:  All right.  And then there becomes the
14   whole issue from the plaintiff's perspective that you've got
15   Judge Walker's order, and is there then a 1983 action?  But that
16   doesn't mean that you're subject to the injunction.  It simply
17   would mean you might be subject to some sort of civil liability.
18             I'd give you the example of Judge Hinkle, for example,
19   passing on the legality of gay marriage.  He didn't issue a
20   statewide injunction, but he did very much put every individual
21   that didn't follow that injunction in jeopardy of individual
22   liability, which is a separate issue.  I understand.
23             I just wanted to make plain that I understand.  It's a
24   little bit more involved and there's some collateral
25   consequences.  But the fact remains, for standing and
```

1  redressability I've got to be able to issue an injunction for

2  which the plaintiff can get the relief they seek.  And here,

3  simply enjoining the chairperson as opposed to the Commission as

4  a whole doesn't get you there is my understanding of your

5  position.

6           MR. NEWHALL:  That's exactly right, Your Honor.

7           MR. RANDAZZA:  Your Honor, it would not be uncommon

8  for an injunction to apply to an individual at all acting in

9  concert with them, to extend its umbrella over these other two

10 commissioners.

11          And then, of course -- I'm just thinking creatively

12 here -- we could certainly amend within 24 hours to add their

13 names, file a supplemental motion of one page, We wish to join

14 these two in the motion for preliminary injunction.

15          THE COURT:  I'm not going to pass on those questions.

16 You certainly could amend.  I don't think that Mr. -- amend your

17 complaint.  I don't think defense counsel would disagree.

18          You haven't filed a motion to dismiss; right?  There

19 is nothing in front of me?

20          MR. NEWHALL:  I have not, Your Honor.

21          THE COURT:  So as a matter of right, they could amend

22 and they can serve.

23          And asking ain't getting, but they certainly can ask;

24 correct?

25          MR. NEWHALL:  They could ask the Court.

```
 1          THE COURT:  All right.  And then the second issue is
 2  you'd then seek to file a supplemental motion, and that means
 3  you can incorporate by reference what you filed.  The question
 4  is is that a proper motion.
 5          And I'm not going to rule on that right now.  That's
 6  why I said you can go pull --
 7          MR. RANDAZZA:  Yes.
 8          THE COURT:  -- case law.  And as a starting point,
 9  I've addressed this before.
10          I believe as it relates to standing and *Ex Parte Young*
11  and Rule 25, y'all have answered my questions in that regard.
12  You've also answered my question regarding the structure of the
13  Commission on Offender Review.
14          As to those first two sets of questions, anything else
15  defense counsel wishes to add?
16          MR. NEWHALL:  No, Your Honor.
17          THE COURT:  Plaintiff's counsel?
18          MR. RANDAZZA:  If this does address your question --
19  if not, if it's another subject, it's unrelated -- but we also
20  do have -- you know, we are seeking the declaratory relief of
21  relieving her of this status.  There is nothing saying he cannot
22  associate with Ms. Foy.  He cannot associate with the victim.  A
23  declaration from this Court that she has been relieved of that
24  status would be --
25          THE COURT:  What's the legal theory?
```

1              I understand the legal theory of, I get to talk to my

2     son -- I'm understand -- I'm not saying I agree with it, but, I

3     get to talk to my son, which would include my right to have a

4     response from him, which we are going to talk about in a minute.

5              You've got a theory that says, Judge, I, as part of

6     my, you know, forgiveness that I want to do, you've also got an

7     associational claim.  I understand the different claims.

8              But help me to understand, what is the legal theory --

9     I mean, I can issue a declaration that it's unconstitutional for

10    somebody to be prohibited from doing something, and here's the

11    theory why.  And then I can issue an injunction paralleling

12    that, directing somebody to do something to remedy that

13    constitutional violation.

14             But what's the legal theory where I would be -- under

15    what claim am I declaring that Ms. Foy is not a victim?

16             MR. RANDAZZA:  Due process, Your Honor.

17             Now, victim status under the Florida Constitution

18    is -- until this case I have never seen it as anything but a

19    privileged class.  You get, certainly, benefits for being a

20    victim.  That was the intent of Marsy's law, to make sure that

21    these people who suffered from criminals were afforded rights.

22             But this is the first time I've seen that status

23    turned into something punitive.  If it's going to be a punitive

24    status, then she should have due process.  She has never

25    testified in any criminal case.  She has never been asked, Do

 1    you want victim status?  And I -- you know, I'm not going to

 2    hide from the fact that this is a novel legal theory.  No lawyer

 3    wants to be told that in a federal court, but I don't run away

 4    from it.

 5           She --

 6           THE COURT:  What's your best case -- and I understand

 7    there is not a case directly on point, because you would be

 8    waving it right now to me if there was.

 9           MR. RANDAZZA:  I would.

10           THE COURT:  Help me to understand, other than just

11    generally, Judge, you've taken away my right, is it, You've

12    taken away my right of association without due process of law

13    because I never had the opportunity to be heard as a victim and

14    whether I'm going to be labeled as a victim?

15           I want to understand exactly what the theory is or

16    sort of the legal construct.

17           MR. RANDAZZA:  The theory is similar to it when you

18    have -- you know, most of the cases that talk about something

19    like this are child custody cases, child abuse cases where the

20    State determines that this familial status can be interfered

21    with because of the potential danger to the child, but they

22    recognize there is a First Amendment right to familial

23    association.

24           It's simply never come up in a situation like this

25    where it's a mother who's essentially become -- treated as an

    1    abused child.  And when it's an abused child, that child lacks
    2    agency so the State steps in for that agency.
    3                THE COURT:  Well, let me ask you this:  Because you
    4    are talking about due process --
    5                MR. RANDAZZA:  Yes.
    6                THE COURT:  Sometimes I ask questions for a reason.
    7                Let's circle back to our discussion when I first
    8    started asking about the underlying facts and said they may not
    9    be determinative of anything, but I wanted to understand the
   10    context.
   11                For purposes of due process, it's notice and an
   12    opportunity to be heard.  And she, both initially and then when
   13    she sought rereview, had an opportunity to be heard.
   14                Does due process extend to a result or does it extend
   15    to something as basic as what was afforded Ms. Foy?
   16                MR. RANDAZZA:  That hearing that we heard was
   17    Mr. Graham-Foy's hearing.  As you heard the commissioners say,
   18    We don't hear from the public on things like this.  She might
   19    have talked, but they didn't take anything into account.  It
   20    wasn't her rights being asserted.  As she said in that hearing,
   21    I'm not talking about his rights.
   22                So if he were here saying he didn't get due process, I
   23    think he would have a far weaker argument.  This is the process
   24    set up for you, Mr. Foy, you're --
   25                THE COURT:  Didn't they tell her, though, she could

1    seek review of our decision?

2            MR. RANDAZZA:  They said it, but there is no process

3    that we're aware of where she gets to do that.

4            THE COURT:  Other than what y'all have talked about,

5    which are the letters which are part of the record that were

6    submitted to the Commission and which they rejected?

7            MR. RANDAZZA:  They rejected consideration of them

8    because they don't take input from the public.  So it would

9    be -- certainly she did what she could do.  But I'm sure you're

10   experienced with cases where somebody who doesn't have standing

11   to be in the hearing has sent in letters.  I certainly --

12           THE COURT:  Well, that's why I asked, again, the

13   question I asked, which is what's in the -- again, I promise I

14   ask the questions for a reason.  I said, What's in the record

15   that suggests -- did the Commission explain itself?  Or what do

16   we have in the record that says, A few weeks after we denied it,

17   we are now denying it -- and I'm told there is an email.  What

18   does the record reflect?

19           Did the record reflect that, You sent in the letters;

20   we didn't read them, and we won't consider them?

21           Does the record say, We've considered them; we haven't

22   changed our mind?

23           Or is the record just silent as to what happened and

24   who did what?

25           MR. RANDAZZA:  All I'm aware of the record reflecting

```
 1   is that hearing transcript I read to Your Honor which was,

 2   There's a reconsideration; we are not reconsidering.  That's it.

 3            THE COURT:  That's why I asked.  Because what I heard

 4   you represent to me and I said we could fill in the blanks --

 5            MR. RANDAZZA:  Sure.

 6            THE COURT:  -- We're not reconsidering it, not that,

 7   We can't hear from her and we will not consider her letters.  We

 8   are not reconsidering our decision is what I heard from the

 9   transcript.

10            MR. RANDAZZA:  Yeah.  It says:  *The question is*

11   *whether to modify Condition 33, no contact with the victim.*

12   That recording is 13 seconds long.  It does not reflect even who

13   asked that question.

14            My presumption would be given that this is

15   Mr. Graham-Foy's hearing, it was Mr. Graham-Foy's request.

16            THE COURT:  Well, the first hearing was his hearing.

17   They told her she could seek reconsideration.

18            I mean, what I've got is the facts in front of me.

19   The tape, Plaintiff's Exhibit 1, is in front of me, the initial

20   hearing:  We are not supposed to hear from you.  We don't have

21   public comment.

22            MR. RANDAZZA:  Right.

23            THE COURT:  But if you want to seek reconsideration,

24   you can.

25            MR. RANDAZZA:  I believe --
```

```
 1              THE COURT:  I also asked about the rules, and the
 2    rules don't really explain it.  She then sends in letters which,
 3    it appeared, were then put on the calendar to consider the
 4    question.  The questions on the table -- and I'm not trying to
 5    do Robert's Rules.  But the question on the table is whether we
 6    are going to reconsider our no contact with the victim.  And
 7    they then, the two individuals, consistent with the reg that I
 8    referred to earlier that the same people -- there is a
 9    preference for them to consider any reconsideration -- said,
10    This is on us -- before us.  It's on our agenda, and we've
11    decided not to reconsider it.
12              I understand it's not a detailed explanation, but, as
13    I understand it, that's what's in front of me and what record I
14    have in front of me right now.
15              MR. RANDAZZA:  I understand the record as showing that
16    both of these hearings were Mr. Graham-Foy's.  Mr. Graham-Foy
17    was a party to that.  There is nothing showing that they
18    considered her petition.  So if it were Ms. Foy --
19              THE COURT:  So what else is there in the record other
20    than her -- it just may be, Judge, there is something out there.
21    Mr. Graham-Foy also asked.  So just because you have Ms. Foy's
22    letters in front of you doesn't mean that's what triggered the
23    second hearing that we're talking about.  It could be something
24    else.  And I would agree there could be something else.
25              MR. RANDAZZA:  Right.
```

```
 1              THE COURT:  I just don't know.

 2              But is there anything in the record, whether it's the

 3    email or the letters, that suggests what's on the agenda, why

 4    they are considering it, and what it is they're considering,

 5    what question?

 6              MR. RANDAZZA:  I do have Document 30-6.  There is an

 7    email that shows that the inmate will appear on a docket, a CRS

 8    establishment docket.  It's page 2 of 35.

 9              It says:  *The victim is requesting the Commission to*

10    *allow the inmate to reside with the victim.  The correspondence*

11    *has been placed with the inmate's CRS interview packet.*

12              THE COURT:  It says "the victim" is requesting the

13    Commission.

14              MR. RANDAZZA:  It is the inmate's CRS interview

15    packet.

16              At best, she was a witness, and at that a rogue

17    witness, because they did say, We don't consider input from the

18    public.  So --

19              THE COURT:  So your point is that, Judge, the mischief

20    here is what's before you both in terms of the rules -- I'm

21    sorry -- the statute and then the rules as it relates to

22    conditional release.  There is no mechanism for the victim to be

23    heard or to address their status as a victim.  They've been

24    designated as a victim by the court system, and she's stuck with

25    that designation and any consequence associated with that
```

 1    designation, whether she likes it or not, and she's so labeled

 2    without any input or opportunity to be heard or challenge it.

 3            And so that's the mischief, Judge.  We are not dogging

 4    the Commission, per se, because they're also stuck with the

 5    statutes in the administrative rules.  There simply is no

 6    mechanism to address what's before the Court today, which is

 7    whether or not a victim can say, I'm not a victim, here's why;

 8    or, I don't want to be a victim and I want to -- et cetera.

 9            MR. RANDAZZA:  That is our position, yes, Your Honor.

10            THE COURT:  All right.  I understand the argument.

11    And that doesn't mean I agree with the argument.  That doesn't

12    mean I'm endorsing the argument.

13            MR. RANDAZZA:  Right.

14            THE COURT:  It simply means I understand the argument.

15            MR. RANDAZZA:  Right.

16            THE COURT:  Defense counsel on that point?

17            MR. NEWHALL:  Your Honor, we've been very up front.

18    We maintain that Ms. Foy has no standing, even know, because the

19    conditional release and that no visitation condition has been

20    imposed on her son, not on her.

21            And we've submitted several cases in our brief.  You

22    know, we couldn't find any from the Eleventh Circuit,

23    admittedly, but I think there were three cases that talked about

24    how, you know, in terms of a condition of probation even in

25    family members, one family member doesn't have the standing to

1    challenge the condition imposed on another.

2          So that's our position.  And I don't want to --

3          THE COURT:  So separate and apart from the concept of

4    standing, which I was talking about which is whether or not

5    suing one commissioner could even fix it, this is a different

6    issue, Judge --

7          MR. NEWHALL:  Right.

8          THE COURT:  -- which is does somebody have the right

9    to challenge the conditions?

10          But counsel for the plaintiff is asking a different

11    question, which is, separate and apart from challenging the

12    conditions, he's suggesting there is a due process problem,

13    which, if you have a right of familial association and there is

14    no mechanism, the State can call her a victim; they can call her

15    a can of tomato soup, whatever they want to label her, and

16    whatever they label Ms. Foy has consequences.  And if you are

17    going to label her as something and it has consequences, under

18    the plaintiff's counsels' view, there is a due process issue

19    because you are being denied of rights, in this case familial

20    rights of association, without any opportunity to be heard.  So,

21    in other words, the State of Florida could call anybody a

22    victim.

23          So let's say this.  Let's say that it wasn't Ms. Foy.

24    Let's say that Mr. Graham-Foy also had a girlfriend, a

25    grandmother that was still living, a brother and a sister.

1    Under the State's theory, you could label all those people

2    victims even if they had nothing to do with the crime.  They

3    could be barred in perpetuity, for life, from ever having any

4    contact with their relative and there would be no way to

5    challenge that.

6            So, like, if a judge issued a no-contact order in a

7    criminal case and the no-contact order was, You are not going to

8    have any contact with the following hundred people, and 98 of

9    them had nothing to do with the case, then you would have a

10   mechanism to challenge that.  That person -- both the defendant

11   and, it would seem to me, that person whose rights were limited

12   about what they could do could either -- either the defendant

13   could say this is a condition of probation that has no

14   relationship to the crime and so it's beyond the scope of what

15   the Court can do -- that would be the criminal defendant.

16           But is it true that the Court can bar others, family

17   members that had no connection to the crime, by simply labeling

18   them a victim and those people have no recourse under the law?

19           MR. NEWHALL:  No, Your Honor, I don't think that's

20   correct at all.  And let me state that it's not the State that

21   has declared Ms. Foy the victim.  Her son made her the victim.

22           Now, the constitution was amended, I believe, to add

23   victims' rights in 2018, but this statutory system had been in

24   place for years before that.  I think the -- what was known as

25   the Florida Parole Commission became the -- this Commission on

1   Offender Review sometime in 2014.

2        So there is nothing about this designation of her as a

3   victim and having rights under the constitution of Florida that

4   has any impact at all upon this, I respectfully submit.  And if

5   99 other members of the family who were not victimized were

6   somehow declared to be victims and, you know, said, Okay.  You

7   can't have any contact with them either, then I have to believe

8   that there would be something that could be done.  I mean, that

9   assumes --

10       THE COURT:  Well, that's what I'm asking:  What can be

11  done?  That's sort of plaintiff's theory.  We have a statute

12  that says that it -- or provisions that provide for the parolee

13  to challenge it and seek review, but it's silent as to what

14  anybody else does.  So if here -- let's use a concrete

15  example -- it says you can't have any contact with the victim,

16  Ms. Foy, or anybody in the extended family.  That's the

17  condition that was imposed by the Commission.  What redress, if

18  any, or mechanism to challenge that would exist?  Because what

19  I'm hearing is the answer is none.

20       MR. NEWHALL:  Well, I'm reminded by my co-counsel, who

21  has got a sharper wit than me, that Florida -- the Florida

22  Constitution, I believe Article I, Section 16, does define

23  victim.  So --

24       THE COURT:  Exactly.  But my point is what would be

25  the mechanism to -- which also, by the way, goes to my prior

1    point, which is the State has designated them.  You've just said

2    the State defines victims, so the State has designated her as a

3    victim.  So I understand that it's a result of the actions taken

4    by her son.  We're here because of actions taken by

5    Mr. Graham-Foy.  So I don't want to be cute, but it is the State

6    relying on the very article that you're relying on in the

7    Florida Constitution that's asserted she's a victim based on the

8    conduct of Mr. Graham-Foy.

9          But setting that aside, the question becomes -- they

10   get -- the Commission gets it wrong, and they label somebody as

11   a victim and no contact that doesn't fall within that

12   definition.  What is the mechanism that exists to challenge

13   that?

14         MR. NEWHALL:  Well, Your Honor, it occurred to me that

15   I had come across this case of *Drollinger versus Milligan,* which

16   is a Seventh Circuit case found at 552 F.2d 1220.  It's an

17   interesting case because there was a grandfather whose daughter

18   had gotten into some kind of difficulty and was on probation and

19   a lot of unusual conditions had been placed on the probation.

20   The net effect was that the grandfather was not allowed to have

21   any contact or could not have any contact with his

22   granddaughter.  Neither one of them were involved in the case.

23   Neither one was a defendant or a party to the underlying

24   litigation.

25         And what the -- what the Court ended up saying was --

1   is that did -- as far as the grandfather's associational rights

2   were concerned with the granddaughter, you know, those were

3   violated, and he did have a case.

4          But it went on to say -- this is, admittedly, in a

5   footnote, but it goes on to say that the terms of probation

6   which intend to circumscribe the daughter's conduct are personal

7   to the daughter, even though they may affect the rights of

8   others as well.

9          So the grandfather didn't have any standing to

10  challenge the probation conditions put on his daughter, but

11  because they did affect his associational rights with his

12  granddaughter, he did have some recourse.

13         So I have to believe there's a remedy to this

14  conundrum that the Court has posed.

15         THE COURT:  Yes, sir.

16         MR. RANDAZZA:  I'd just like to address it.  And I

17  didn't catch this when I first read *Drollinger versus Milligan*.

18  I didn't catch this when I first read it either, so I do not in

19  any way criticize my friend for missing this.

20         But in that case, which doesn't seem to have a very --

21  have much more progeny than the Foy family, a father-in-law

22  claimed the condition of probation imposed on his

23  daughter-in-law infringed on his rights, and the Seventh Circuit

24  found that the father-in-law suffered injury -- in fact, it

25  conferred standing -- with respect to his blood relative.  He

1    doesn't have the right to challenge simply anyone, and I get

2    that.  Otherwise, you might have people all the time challenging

3    conditions saying, Well, this is my friend.  This is my choir

4    member.  This is my race car partner.  But this is the right to

5    familial association, and it is never closer than between a

6    mother and a son.

7              And I believe that the *Drollinger* court -- perhaps it

8    would have ruled the same way, but I don't see it fitting into

9    their logic.  This is a -- not just a mother and a son, but as

10   you heard in testimony, this is the entire family.  It ceases to

11   exist here because of -- yes, Mr. Graham-Foy was a criminal.

12   The state named her a victim.  Mr. Graham-Foy pled out.  At no

13   point has she had a voice in this, and she's lost her family.

14             I think the *Drollinger* court would have looked at that

15   very differently than a father-in-law saying, I want to be with

16   my daughter-in-law because my daughter-in-law has a relationship

17   with my grandchild.  It did come around and say, Your

18   relationship with the grandchild matters; in-laws don't.

19             THE COURT:  I understand your argument.

20             Defense counsel, I understand your view of the case is

21   different.  Judge, what they said was there's no right as it

22   relates to changing the terms and conditions of supervision as

23   it relates to the daughter-in-law, blood relative or not, and

24   that the footnote -- I'm sorry -- the issue was whether or not

25   you have a right to see your grandchild.  That had nothing to do

1    with the conditions on the mother; correct?

2              MR. NEWHALL:  That's correct, Your Honor.  I also

3    would add that there's -- if you read the case law about

4    familial relationship and what that can involve, there is

5    nothing that excludes in-laws.  It just depends on what the

6    relationship is between -- it could be in-laws.  It could be

7    third cousins, as long as they all live in the same house or,

8    you know, socialize all the time.  That -- it -- the fact that

9    it involves an in-law doesn't really -- isn't germane.

10             THE COURT:  As it relates to the claim -- as it

11   relates to the religion claim, Counsel, Ms. Foy has said that

12   she wants to forgive her son, and she said she's forgiven him.

13   She says she wants to have contact with him and express that and

14   show it through actions.  And I've heard testimony today that

15   she, in fact, started a letter-writing exchange that then

16   evolved into seeing him in the prison and for years saw him.  It

17   went from once a month to twice a month and saw him at each

18   institution.

19             And then I've got -- I didn't hear further testimony

20   today on the record about faith, so what I'm left with is

21   paragraph 18 of the declaration, quote:  *My Catholic faith*

22   *requires that I forgive my son, one, and that he feel the warmth*

23   *of my forgiveness through my actions and communication, two.*  I

24   haven't heard anything further from Ms. Foy about what her faith

25   requires today at this hearing, so I've got her declaration

which is evidence in front of me.

But when I consider those two parts, that I forgive and that I -- he feel the warmth of my forgiveness through actions and through communications -- and it's undisputed on the record that she's, A, forgiven him; B, expressed her forgiveness, and, C, for a period of almost 13 years repeatedly interacted with him, hugged him, by -- his testimony as well confirmed that he then hugged her and kissed her for 13 years -- what's before me for the religion claim that would suggest that she has been denied?  Is it the theory that there's got to be ongoing exchanges in perpetuity as required by her faith as a Catholic?  Do I have to read that into the declarations since I didn't hear it?

And so what's before me that would sort of put meat on the bones as it relates to the religion claim?

MR. RANDAZZA:  Your Honor, I feel like if we were evaluating anything more than what she said, there might be an -- there might be an ecclesiastical exception that I wouldn't want to wade the Court into.  I think she has expressed that this is a necessary component of it, not that you just do it one time.

I see the logical point here.  She can certainly -- I can certainly recall her to say what I know she would probably say, that this is not something you simply do one time.  I don't want to testify as an expert in Catholicism, but it isn't just

1  a --

2           THE COURT:  The record is what I've got.

3           MR. RANDAZZA:  Yeah.

4           THE COURT:  So my question is why, when I've got that

5  statement in the declaration and it's undisputed on the record

6  that she did not once, but time and again, over and over and

7  over, express in writing initially and then in her visits

8  through hugging and kissing and ongoing communication for 13

9  years -- I'm just -- what's in front of me right now to suggest

10  that her religion claim has legs in the sense that somehow it's

11  in violation of the tenets of her faith that she not continue to

12  interact with him as she did for the last 13 years?

13           MR. RANDAZZA:  I believe --

14           THE COURT:  I know I don't get -- and I would not and

15  I do not go behind --

16           MR. RANDAZZA:  Right.

17           THE COURT:  -- the sincerity of beliefs.  I want to

18  make plain, that's not what I'm asking, and I'm not in any way

19  challenging the sincerity of her beliefs or her belief system.

20  That's a different issue.

21           The question becomes, in light of that paragraph in

22  her declaration, coupled with the undisputed evidence that she

23  had forgiven him, both in writing and in person, was able to hug

24  him and hug it out -- I don't mean that in a slang sense, but in

25  terms of their description of their interaction for a period of

1  13 years.  When I've got that in front of me, I want to make

2  sure I understand the theory of the claim.

3       MR. RANDAZZA:  While it is not evidence in the record,

4  Your Honor, perhaps I'm just too close to the faith to consider

5  this to be something.  I --

6       THE COURT:  Are you saying, It's self-evident, Judge,

7  that you have to continue to do that.  It can't stop after 13

8  years?  Is that the --

9       MR. RANDAZZA:  As a Catholic it is to me, Your Honor,

10  but I don't say it's self-evident that you've got to be

11  deficient if you don't know that.  Just --

12       THE COURT:  No, no.

13     (Indiscernible crosstalk.)

14       THE COURT:  It could be self-evident that that --

15  based on her expression of faith that it would be ongoing.  I

16  didn't mean self-evident to a Catholic or non-Catholic.  I just

17  meant that in context it would be self-evident that it would be

18  ongoing.

19       MR. RANDAZZA:  That is how we see it, Your Honor, yes.

20       THE COURT:  Defense counsel wish to be heard on that

21  point at all?  I've read your papers and that's why, obviously,

22  I've asked the questions I asked.

23       MR. NEWHALL:  No, Your Honor.  We just submit that

24  she's -- you know, she's -- we stipulated she's a Catholic.  I

25  have no reason to doubt her sincerity as such.  She's forgiven

 1    her son.  The Commission certainly hasn't interfered with her

 2    right to do that, her ability to do that.

 3          THE COURT:  Let me turn to plaintiff's counsel and

 4    help me to understand, both as it relates to the First Amendment

 5    claim and the -- well, there's different species, but the right

 6    to communicate with him as distinguished -- so let's not call it

 7    First Amendment, because I understand the First Amendment is

 8    broader than that, but communicate with him, and then the

 9    alternative argument as framed as a religion claim -- which are

10    two distinct theories you've argued; correct?

11          MR. RANDAZZA:  Yes.

12          THE COURT:  Help me to understand -- if the evidence

13    is he can't contact her, but there's no provision that she can't

14    send him a letter -- so it's not an absolute deprivation --

15    what's the case law that talks about the right to communicate

16    separate and apart from the religion claim, involves the right

17    to get an answer, that is, a right to engage in a dialogue with

18    the other person as opposed to just speaking to them?

19          MR. RANDAZZA:  We thought of it in a more limited way,

20    Your Honor.  If she sends a letter -- and as she testified, as

21    she understood, if she even sends a letter to him, no contact

22    with the victim means that envelope better be stamped "return to

23    sender" or he's violated the terms of his probation.  The State

24    wouldn't even let --

25          THE COURT:  Look, I understand, and we would have this

```
 1    contact -- we would have this conversation, when I was a state

 2    court judge and was assigned to the family law division, in

 3    injunction hearings all time:  What does no contact mean?  What

 4    if the person shows up at your house?  What if they start

 5    walking across the street to see you?  What if they show up at

 6    the school?  And we give them the instructions that, You leave

 7    the school immediately.  You walk in the other direction.  You

 8    don't speak.

 9            So, as I understand it, your response is, Judge, in an

10    abundance of caution, she doesn't want to set her son up to be

11    sent back to prison --

12            MR. RANDAZZA:  Correct.

13            THE COURT:  -- because she's fearful that if she sends

14    him a letter and he gets it and opens it and reads it that the

15    Commission will say by him accepting the mail and reading it,

16    he's having indirect contact with her.  And every state court

17    judge in this state 100 times a week, that's in family law or

18    criminal law court, says, No contact means no direct or indirect

19    contact.  And she's not going to be the cause of sending him

20    back to prison, and nobody has told her she can write him, and

21    it would seem to fall within the ambit of indirect contact for

22    him to accept mail or communication from her, even if he doesn't

23    respond to it.

24            MR. RANDAZZA:  Sure, even a phone call.  We considered

25    that if she is in the hospital and on her deathbed and she calls
```

him, and he has caller ID on his phone and says, That's my mom's

number -- if he hits "accept" on that call, he's violated -- at

least to her, he's violated that.

THE COURT:  Even if he doesn't talk?

MR. RANDAZZA:  I think so, because that's contact.

THE COURT:  All right.

MR. RANDAZZA:  The State wouldn't even allow that she

could be -- wouldn't even agree that she could be in the same

room when he was testifying on the screen here.  So if they are

looking at it that stringently, her speech is certainly chilled

when the consequences of speaking could be the destruction of

her family.

THE COURT:  Let me hear from defense counsel on that

point.  Y'all did take the position that, Judge, they should

not -- she should not be in the room if he's testifying via Zoom

because it could result in him speaking to her, and her being in

the room would be in violation of the condition of no contact.

If that is, indeed, the view of no contact, why would that --

why would -- if her just hearing him talk would be contact, why

would her sending him a letter not be no contact?

MR. NEWHALL:  Your Honor, we've taken the position in

our briefing that she can send him letters.  The Commission has

not ordered her to have no contact with her son.  The contact --

the no-contact condition is personal to Mr. Graham-Foy.

THE COURT:  Oh, she can send him letters.  The

1    question is really different.  I don't think you're slicing the

2    bread that thin.  But the issue is can he actually read her

3    letters?  That's a different issue.

4         MR. NEWHALL:  Your Honor, I'm going to speak for my

5    client here.  This is a question I haven't asked them, but I

6    would certainly think -- first of all, this is something that

7    would get -- should it ever get to that point, be fleshed out in

8    discovery, I suppose.  But I would certainly take the position

9    that she can send him a letter, and if she can send him a

10   letter, he can read the letter.  Reading her communication --

11        THE COURT:  He just can't respond to it, directly or

12   indirectly?

13        MR. NEWHALL:  That's correct.

14        THE COURT:  So directly or indirectly means, Judge,

15   not that she can't send him a letter, but what he can't do is

16   either write her a letter back or he can't go next door to his

17   friend and say, Mama just sent me a letter and asked me these

18   ten questions.  I want you to go tell her X, Y, and Z in

19   response.  So you can't either respond to her directly -- or

20   indirect contact would be having somebody else reach out to her

21   to speak to her on your behalf.  Indirect doesn't include

22   accepting something from the person?

23        MR. NEWHALL:  That's correct, Your Honor.

24        THE COURT:  All right.  I understand y'all's

25   responses.

1          Yes, sir.

2          MR. RANDAZZA:  If I could just revisit the issue of

3    the commissioners.  I am reminded by my co-counsel that we did

4    have a case that I think might help.

5          *Rivers versus Pate*, P-a-t-e, that is 2013 Westlaw

6    5745703 at page 2 out of this court.  There only the chair was

7    sued, and the court there did determine that under the *Ex Parte*

8    *Young* doctrine official capacity suits for prospective relief

9    are not deemed to be suits against the State.

10         THE COURT:  Oh, that's absolutely true.

11         MR. RANDAZZA:  It doesn't directly --

12         THE COURT:  That's a different issue.  I already said

13   you won on *Ex Parte* --

14         MR. RANDAZZA:  Okay.  It does --

15         THE COURT:  You can sue her because she has some

16   connection --

17         MR. RANDAZZA:  Right.

18         THE COURT:  -- and you can certainly sue her in her

19   official capacity because that's an exception to *Ex Parte Young*.

20   You win on those two questions.

21         This is -- what I was talking about is a different

22   question, which is do you have standing based on injury.  You've

23   asserted an injury.

24         MR. RANDAZZA:  Right.

25         THE COURT:  The defense can talk about no injury all

```
 1    they want, but there's an injury.  She can't talk to her son.

 2              MR. RANDAZZA:  Right.

 3              THE COURT:  The question then becomes, though -- is

 4    traceability and redressability.  Well, it's traceable to the

 5    Commission and the two commissioners, but -- they're the ones

 6    that said no and said no again.  But the real issue is

 7    redressability as well, and redressability and traceability

 8    often overlap.  But just because you're a proper party in your

 9    official capacity as a commissioner under *Ex Parte Young* doesn't

10    mean you have the ability to redress the wrong, which is a

11    different issue.

12              Does that case address the question of standing and

13    redressability?

14              MR. RANDAZZA:  It appears that the defense counsel in

15    that case was less skillful than the defense counsel here and

16    either did not -- or the defense in that case simply did not

17    raise this issue and felt that if the chair --

18              THE COURT:  Well, the Court would have had an

19    independent obligation to raise it, but -- and the

20    Eleventh Circuit, I can assure you, would remind me of that if I

21    didn't.

22              But separate and apart from that, the Eleventh Circuit

23    also made plain that the inquiry under *Ex Parte Young* is

24    different than the inquiry for standing, and they are.

25              First of all, before I could even get to *Ex Parte*
```

1   *Young*, I have to address the standing, because if I don't have

2   jurisdiction, I can't even consider the question of whether or

3   not the commissioner is a proper party under *Ex Parte Young*.

4   Now, I realize that's a little backwards because the standard

5   under *Ex Parte Young* is lower -- some connection -- than the

6   redressability and traceability components -- injury being the

7   third -- for standing.

8          And I also understand it's not uncommon for judges --

9   and I probably have done it myself -- to say there is no

10  connection so they are not a proper defendant under *Ex Parte*

11  *Young*, because it's a lot easier to address that in some cases

12  than it is to address standing, which is more complex.  And I'm

13  probably guilty of that as well.  But what the Eleventh Circuit

14  clearly teaches us is there's two distinct concepts, and before

15  you reach *Ex Parte Young*, you should address standing, because

16  jurisdiction -- I don't get to look at anything else if there is

17  no jurisdiction.

18         But -- y'all didn't need that CLE, but I just -- lest

19  there be any confusion when it comes before -- or if this does

20  go before the Eleventh Circuit, I get that part.

21         Let me turn to a different question as it relates to

22  all the claims that, quite frankly, flummox me when y'all start

23  talking about strict scrutiny.  And I understand here we're not

24  talking about a prisoner; we're talking about the family member

25  of a prisoner.  But I just, for the life of me, don't understand

1  why the *Turner* test is not the proper test and the question

2  isn't whether or not there's a penological purpose -- whether

3  the penological purpose standard applies.

4        While I can't -- I haven't found a case that directly

5  addresses this.  I'm familiar with *Prison Legal News,* which went

6  up to the Eleventh Circuit and was affirmed, which says that

7  even a blind squirrel can find a nut once in awhile.  Probably

8  not the smartest thing I've ever said on the record.  But in

9  that case, it was a not-for-profit entity that wanted the

10  ability to mail their publication to prisoners.  So it wasn't

11  just the prisoner; it was the not-for-profit.  And it was

12  evaluated under *Turner*, and that was the whole issue on appeal

13  where Paul Clement, the former solicitor general, argued that I

14  had gotten it wrong, and he was disabused of that notion.

15        Then we've got the *Overton* case out of the U.S.

16  Supreme Court, which is found at 539 U.S. 126, from 2023, where

17  there was a class of plaintiffs, which included family members,

18  talking about rights in prison, and again there the Supreme

19  Court, while they didn't expressly address the issue, evaluated

20  it under the *Turner* standard as well.

21        And I want to make plain, they did not say, We have

22  both prisoners and family members.  Their claims are

23  indistinguishable.  Both claims have to be analyzed under

24  *Turner*.  The Supreme Court just, in fact, analyzed all the

25  claims and didn't distinguish between them.

1          So I guess that's -- and I'll start with the defense

2   for that.  Why are these claims -- because I believe there's

3   case law that suggests that whether you're in prison or you're

4   on conditional release, that wouldn't change the analysis.  It

5   would be still subject to a *Turner* analysis.  And if it's that

6   we're not going to distinguish between nonincarcerated family

7   members, I'm just -- and there's cases where that's been done --

8   I'm just not sure why *Turner* doesn't apply.  It's slightly a

9   softball question for you in the sense that it lowers the

10  standard for you, but I'm just -- I'm concerned that the

11  Eleventh Circuit would tell me the proper analysis is under

12  *Turner*, not strict scrutiny.

13          MR. NEWHALL:  Well, Your Honor, I addressed strict

14  scrutiny just because that's the strictest standard there could

15  be.  I submit that even if you found standing that -- and found

16  that that was the proper test, that would be the appropriate one

17  now -- the appropriate standard.  But it would -- that --

18          THE COURT:  You were saying, Judge, even under the

19  highest standard we win --

20          MR. NEWHALL:  We've met it.

21          THE COURT:  -- and I understand that.

22          But setting that aside, I'm going to ask you -- and

23  I'm going to ask plaintiff's counsel -- why it shouldn't be

24  properly analyzed under *Turner*.

25          MR. NEWHALL:  I have read the *Prison Legal News* case,

1    Your Honor, so that's my familiarity with the *Turner* standard.

2    I agree that they -- it was something less than strict scrutiny

3    that they applied.

4            And if you -- if the *Turner* standard applies to this

5    case, then, again, we prevail.  If the plaintiff has standing,

6    then we've met strict scrutiny.  We would also meet a lesser

7    standard.

8            THE COURT:  Well, let me go ahead and pause there,

9    then, and ask you about strict scrutiny and -- as it relates to

10   the facts of this case.  Does not -- does strict scrutiny in any

11   way entail your ability to fashion less restrictive means?

12           MR. NEWHALL:  Well, Your Honor, I think it's been

13   suggested that we could give him a condition of nonviolent

14   contact, but that's not really a condition --

15           THE COURT:  How about just written contact?  You can

16   write to your mother and you can talk to her on the phone, but

17   you're not in a prison.  We can't control you like we did in the

18   prison, but we're going to let you talk to your mama on the

19   phone and write your mama.

20           I just did a wedding in Ireland.  I told y'all I went

21   to Ireland.  I'm reminded of the famous Irish quote about who

22   are you going to love.  You are going to love your wife.  You're

23   going to love your children.  But it ends with the Irish slogan

24   that the person you're going to love the longest is your mom

25   because she gave birth to you and knew her for the longest.

So -- and I'm not suggesting the Irish and their little ditties

are controlling of the question.

        But I just -- for the life of me, if I'm going to

apply strict scrutiny -- and we know that the State of Florida

let them have contact on the phone, in writing, and in person.

I understand that's much different than living together, and I

understand it's much different in a prison setting where you can

control the contact than where it is if you're physically

together without supervision.  So I'm not in any way suggesting

that because of that contact that means that you have to allow

them to live together, and I'm not suggesting you have to let

them even be physically in the same place, because you don't

have the same control that you would.

        But if we're talking about a right of association --

let's assume there's standing -- I know you say there isn't --

and the right parties were sued, I'm just really struggling

with -- and you state a claim, I guess, with -- under a

particular theory -- I'm just adding that in as preconditions.

If we're talking about something being evaluated under strict

scrutiny, I just, for the life of me, don't understand -- when

we all know that you could email or call on the phone or send

letters, that that communication would be a less restrictive

means to avoid the physical contact, as was implied today:

stealing the drugs out of her drug cabinet, getting upset

because you're around her, being set off and knocking her to the

1   ground.

2          I understand all those limitations, but I just -- if I

3   was going to apply strict scrutiny, which, by the way, rarely

4   does the law survive strict scrutiny, just as rarely is it not

5   found unconstitutional based on rational basis -- there's

6   exceptions to both, but generally that's the case.  I just --

7   especially here where it seems to hit us in the face that you

8   could have a no physical contact provision or you can't be

9   within five miles of her or something, but you could allow phone

10  calls.  And I know it's not me to -- I'm not trying to fashion

11  an alternative remedy.  I'm just saying if it's subject to

12  strict scrutiny, don't I have to consider that?

13          MR. NEWHALL:  You have to consider less restrictive

14  means, Your Honor.  If you're -- if the remedy is not narrowly

15  tailored, then you can --

16          THE COURT:  In light of what I've heard about what the

17  State of Florida allowed her to do for 13 years, how is this

18  application of no contact possibly narrowly tailored?

19          MR. NEWHALL:  Well, Your Honor, the Commission views

20  this as -- well, I would say that they view this -- they are

21  looking at a relationship between a criminal perpetrator and a

22  victim of the crime.  Now, I don't need to get back into the

23  whole definition of victim, but they've got a no-contact

24  provision with the victim.  They don't say a no contact -- they

25  don't have a no-contact provision with your mother.  It's

1   just -- unfortunately for Ms. Foy -- or Graham-Foy, his victim

2   was his mother.  That's his problem.  That's his fault.  That's

3   not the Commission's fault.

4         THE COURT:  But it's become Ms. Foy's problem.  I

5   mean, that -- isn't that why we're here?

6         MR. NEWHALL:  Well, yes, sir.

7         THE COURT:  I mean, Mr. Foy is not in front of me and

8   his --

9         MR. NEWHALL:  Well --

10        THE COURT:  What I'm being told is because we want to

11   protect victims, we have a bright-line rule that we're not going

12   to engage in any tailoring, and we have a right to have the

13   bright-line rule, and because the -- to protect the person we've

14   identified as the victim, we're going to say no contact -- no

15   contact at all of any kind and not try to fashion it or tailor

16   it.

17        And I get it.  If you've got thousands of inmates, you

18   have a bright-line rule because you don't want to have an

19   individualized review of every person and their circumstances,

20   which are all unique.  So maybe it's born as a practical matter,

21   but -- I mean, here the fact of the matter is they're imposing a

22   restriction that isn't just limited to Mr. Foy.  It impacts

23   Ms. Foy because she's also -- and I guess your point would be

24   based on the Seventh Circuit case you relied on, Judge, it's not

25   a restriction on her; it's a restriction on him.  And the fact

```
 1    it has a collateral consequence of having an impact on her is

 2    not a cognizable claim.

 3              MR. NEWHALL:  Correct, Your Honor.

 4              THE COURT:  I understand.

 5              Counsel?

 6              MR. RANDAZZA:  Your Honor, I'd just like to correct

 7    that it's not a bright-line rule.  It's -- that was a checklist

 8    that they have and --

 9              THE COURT:  Well, they -- even their own rule says

10    that unless the victim waives it; right?

11              MR. RANDAZZA:  Well, the Florida Constitution says if

12    the victim wants, then that's what they should impose.  That's

13    what the Florida Victims' Bill of Rights says.  Unfortunately,

14    it appears that the commissioners have --

15              THE COURT:  I meant isn't that the rule within their

16    own policy, the Commission, that it's "unless the victim"?  I

17    thought I read that repeatedly, that that was a -- they even

18    have their own carve-out recognizing that an exception is when

19    the victim wants it.

20              MR. RANDAZZA:  I'm not -- I don't have that as total

21    recall there, so maybe --

22              MR. NEWHALL:  Your Honor, if -- he's, I think,

23    referring to Section (7) of 947.1405.  That only applies to

24    certain sex offenses.  So that statute --

25              THE COURT:  What only applies to certain sex offenses?
```

1    MR. NEWHALL:  Well, the -- any -- the -- what I

2    assumed that I -- we were talking about.  If I assumed wrongly,

3    I apologize.

4         THE COURT:  Go ahead.  I just want to make sure we are

5    all on the same page.

6         MR. NEWHALL:  Yeah, it's Section 947.1405(7)(a), and

7    it talks about any inmate who is convicted of a crime involving

8    certain statutes, and they're all of a sexual nature, and is

9    subject to condition -- oh, yeah, subpart 4:  *A prohibition on*

10   *any contact with a victim, directly or indirectly, including*

11   *through a third person, unless approved by the victim...*  That's

12   what you were referring to.  There is a --

13        THE COURT:  So it's only for those offenses?

14        MR. NEWHALL:  Only for those offenses.

15        THE COURT:  If you rape somebody, they can agree to

16   chat with you, but if you have any other offense, you can't?

17   That's -- is that what I'm -- I don't get to make policy

18   choices.  I just want to make sure what the State of Florida has

19   decided, that the only people that can waive and have contact

20   over the Commission's objections are rape victims --

21        MR. NEWHALL:  Well, Your Honor --

22        THE COURT:  -- or little children that are molested?

23   That's an odd policy choice, but maybe -- there's been a lot of

24   odd policy choices, so maybe that's one of them.

25        MR. NEWHALL:  Yeah.  Well, I want to just -- it's not

```
1    just the victim.  It has to also be approved by -- a qualified

2    practitioner in the sexual offender treatment program and the

3    sentencing court and the victim would all have to agree to that.

4              THE COURT:  So we have process for -- to hook rape

5    victims and molested children up with their tormentors but not

6    anybody else.  I understand.

7              Clearly, as I've said before, when I say "I

8    understand," it doesn't mean I agree or it makes sense to me.

9    It's just that I understand what the law says.

10             And I want to make plain, defense counsel didn't write

11   the law.  That wasn't your exception.  You didn't draft the

12   exception.  I just --

13             MR. NEWHALL:  And the law won't let rich people sleep

14   under bridges either, Your Honor.

15             MR. RANDAZZA:  You made my point for me, Your Honor.

16             THE COURT:  All right.  That last comment was almost

17   too good to leave that as an opening line of an order, but I --

18             MR. NEWHALL:  Forgive me if I'm giving you creative --

19             THE COURT:  No, I promise I won't throw that back at

20   you, Counsel.

21             MR. RANDAZZA:  Your Honor, did you want us to address

22   the scrutiny levels?

23             THE COURT:  I want you to talk about why Turner is not

24   the proper test.

25             MR. RANDAZZA:  When it is a family relationship,
```

1  associational right, *Roberts versus United States Jaycees, Pi*

2  *Lambda Phi Fraternity, Incorporated versus University of*

3  *Pittsburgh* --

4          THE COURT:  Give me those cites so it's clear.

5          MR. RANDAZZA:  The *Pi Lambda Phi Fraternity* case is

6  229 F.3d 435, quoting *Roberts versus United States Jaycees,* 468

7  U.S. 609 at 619 to 620.  These address the issue of when it is

8  the First Amendment right to familial association, strict

9  scrutiny does apply.

10         However, let's -- let's use *Turner*.  I understand

11 *Turner* is a -- *Turner* is really the fifth level of scrutiny.

12 You've got strict, intermediate, rational basis, then *Tinker* for

13 schools, and then under that, way at the substrate, is

14 legitimate penological reasons.  So this is why Indiana and

15 Connecticut a few years ago banned adult entertainment books in

16 prisons, and it really didn't need to get into all the content

17 of that.

18         But if we apply this, say there's got to be a

19 legitimate penological interest, I think the testimony we've

20 heard today is that the penological interest here seems to be in

21 keeping him -- you know, keeping him from recidivism.  Well, it

22 seems that he would be more likely to reoffend, more likely to

23 relapse, in the current condition.

24         THE COURT:  Well, wasn't the penological interest and

25 the evidence in front of me that -- and so I listened; I

1   reviewed the record so it was more of a summary than facts of

2   first impression.

3           But as defense counsel asked both witnesses, you've

4   got somebody that repeatedly has relapsed.  His drug abuse led

5   to the crimes.  This is his first time in 13 years outside of

6   the prison setting.  The reason why we have this process,

7   meaning you've got people that are released earlier -- it

8   applies to certain crimes as mandatory because we want to create

9   a bridge back into the community, and the penological interest

10  is if we've got somebody that was the victim as a result of drug

11  abuse, somebody who has relapsed after repeated attempts at drug

12  treatment, coupled with all the things that you face when you're

13  transitioning back in the community, we want to protect the

14  victim by not putting the victim in the position where they're

15  going to be subject to somebody who, through the very record of

16  this case, has a history of getting out, relapsing, and harming

17  them.

18          Whether I agree with that or not is immaterial, or

19  whether that would be my choice, or whether I would give a more

20  individualized review of the facts of this case is immaterial.

21  But the issue is that's the stated penological interest, is that

22  we have folks all the time that want to see their tormentor.

23          I mean, if I had a dollar for every time somebody came

24  in and recanted as the victim of domestic abuse when I was a

25  state court judge, you know, I could have retired early, because

1    the -- and there's a whole body of case law in Florida about

2    when can you move forward with your battery case, misdemeanor,

3    or your felony battery.  And I don't -- I know felony battery is

4    a term of art, so I'm putting that in quote marks because there

5    are different species of battery that become a felony, not

6    simply your third simple battery, which is one way of having a

7    felony battery.  But I digress.

8         But the whole body of case law deals with, well, you

9    can rely on -- the officer can have excited utterances from the

10   victim.  They can talk about the injury to the victim.  There's

11   a whole lot of ways to get into testimony where you don't have

12   to have a victim.  It's still sufficient evidence to secure a

13   conviction because -- and the reason why we have that whole body

14   of case law is there are so many people that, for a variety of

15   reasons, recant.

16        And I guess part -- and I understand Ms. Foy wasn't

17   with a lawyer when she appeared before these commissioners.  But

18   if I'm a commissioner and the chairperson -- I don't know if

19   it's in the record.  Y'all can tell me if it's not in the

20   record.  She was a state prosecutor here for years, and she

21   wasn't on the panel, so that's why I'm using her as an example.

22   I'm not relying on -- because I don't know anything about the

23   other two commissioners.

24        But if you show up in a hearing and say, I need help.

25   I physically have limitations.  I need this person in my life --

```
 1   and your entire penological interest is to protect the victim,

 2   and there's been a history of abuse based in that relationship,

 3   that normally is -- for a judge, or in this case commissioners,

 4   is not going to be -- and I'm not saying that's what -- would be

 5   a concern here, but that actually would be a red flag to most

 6   people, because as a judge when people came in and recanted,

 7   well, of course they recanted.  They want their husband released

 8   from prison so they can go back to work because he's the only

 9   household income, and they don't want them prosecuted and

10   sitting in jail.  They want him released because they are

11   financially dependent on their husband.

12          And I want to make plain that's not what's going on

13   here.  Look, I've heard the testimony.  He's been in custody for

14   13 years.  I saw him testify.  I get it in terms of -- that not

15   all cases are the same.

16          But from the standpoint of a commissioner who has to

17   review a ton of cases, somebody coming before commissioners and

18   saying, I want to have contact so they can help me, as opposed

19   to, They no longer represent a danger and here's why, even as a

20   judge that would have been a red flag to me.

21          So this idea that it was -- the Commission cavalierly

22   rejected it -- I mean, they even said, Well, we've got to

23   protect the victim, and sometimes we understand you want to have

24   contact because you're saying you need the contact -- I mean, in

25   fairness to the two commissioners in this case, it was presented
```

1    to them in a very different way.  I'm not saying they would have

2    reached a different conclusion, but nobody came and said, My son

3    has been clean for 13 years.  That's what's different from the

4    prior relapses.  Nobody said, We've had contact on a bimonthly

5    and the wardens did it, and there was a psychological report and

6    they determined it was in my interest.

7            None of what's been presented to me was before the

8    Commission.  Instead, they had a victim of a crime which, based

9    on the description of the crime, was very violent, involving a

10   knife and a frying pan and sending somebody to the hospital, and

11   then they're told, I'm now elderly.  I'm even more vulnerable,

12   and I need him.

13           I guess my concern, Counsel, when I start looking at

14   penological interest in that context and what was actually

15   communicated to the board, protection versus desire -- and the

16   desire is "I need help because I'm elderly" -- it just --

17   it's -- I don't get to telegraph to the commissioners that made

18   that decision what I now know; right?

19           MR. RANDAZZA:  I think you could.  Actually, it gives

20   me an idea that we could compel Commissioner Coonrod to hold a

21   review hearing -- can't compel anybody to vote a certain way,

22   but to hold a review hearing with this record to be considered.

23           THE COURT:  Well, you could compel her to have a --

24   you're saying compel her to have a hearing under due -- the

25   theory of due process because there has never been a hearing for

```
 1   her?

 2          MR. RANDAZZA:  I believe that, yes, and I think the

 3   Florida Victims' Bill of Rights compels far more due process

 4   than she was afforded.  I mean, they -- you know, we might --

 5   one might argue, whether it was due process enough or not due

 6   process enough, but when the State creates the architecture of

 7   what needs to be due process, when the State says these are the

 8   parameters, which is a right to due process for the victim, in

 9   fairness and respect for the victim's dignity, I don't think

10   anything we heard in that hearing would rise to a shadow of

11   that.  In fact, all they told her was, We're not going to hear

12   from you, and, by the way, you can just appeal this.  There

13   actually isn't a process for her to do that, so it's --

14          THE COURT:  So it's not entirely clear to me whether

15   they didn't allow the appeal based on the letters, the minute

16   that was on the docket, based on even the reference you read to

17   me.  I mean, I've got to look at the record and see what's in

18   it.

19          MR. RANDAZZA:  Right.  But I don't see anything there

20   that says Foy versus the Commission.  This is all Graham-Foy

21   versus the Commission.  At best, she was a witness in all of

22   those.  So she doesn't even have -- I mean, they are correct in

23   one part of this.  She doesn't have standing in those

24   proceedings.  But those proceedings should have treated her with

25   far more respect than they did.  So perhaps if she had been even
```

1  listened to, she could have added more testimony to that, but

2  you heard them rush her through that and say, We are not going

3  to listen to you.  We are going to move on.

4       Yes, her arguments were couched in terms that she

5  thought the Commission would listen to more than where her heart

6  is.  Trying to bring these injury-in-fact claims for her is

7  somewhat astute for a layperson, but still I don't think she was

8  afforded due process.

9       And then if we look at the level of scrutiny here --

10  and I don't even agree that *Turner* applies, but if we do look at

11  it, the legitimate penological interest still needs to be

12  legitimate.  There needs to be some way that this is going to

13  contribute to somebody's rehabilitation.  This seems to counter

14  rehabilitation.  Is it going to strike against recidivism?  This

15  seems to strike for recidivism.

16       It just seems that -- and if we look at the sheet

17  itself, one thing that was so striking to me is that the two

18  things that he did, drugs and violence, well, if he's got time,

19  then he should address those things, but no matter what the

20  condition, he can't be around this person that we've named

21  "victim" who has never had a chance to refute that status.

22       THE COURT:  I understand your argument.

23       Let me find out -- normally what I do when I've gone

24  through the questions I have, I give y'all an opportunity to go

25  back, review your notes, talk to your co-counsel, and then come

1    back and tell me how much additional argument you have.

2           Let me start with counsel for the plaintiff.  Do you

3    need to huddle up first, or do you know how much additional time

4    you need for argument?

5           MR. RANDAZZA:  I wouldn't want to make a decision

6    without a five-minute huddle, Your Honor.

7           THE COURT:  All right.  We'll take a five-minute

8    break.

9           Thank you.

10     (Recess taken at 4:11 PM.)

11     (Resumed at 4:24 PM.)

12           THE COURT:  Please take your seats.

13           Counsel for the plaintiff, have you had an opportunity

14    to chat with your colleagues?

15           MR. RANDAZZA:  Yes, Your Honor.

16           If you have no further questions, I think we would

17    need no more than ten minutes.

18           THE COURT:  Counsel for defense?

19           MR. NEWHALL:  Your Honor, I don't believe we would

20    need any more than ten minutes either.

21           I would ask the Court's indulgence.  If I could start,

22    my colleague, Ms. Spears here, is a new lawyer, and I'd like her

23    to have the opportunity to argue.

24           THE COURT:  She certainly can.  Absolutely.

25           All right.  Counsel for plaintiff.

1          MR. RANDAZZA:  Your Honor, I think it would be

2    difficult to say there isn't a tremendous injustice here.

3    Ms. Foy, as she's testified, is looking at a limited time of

4    life.  This is her only family.  This is, essentially, a death

5    sentence for her family.

6          I will fall on my sword that I should have brought in

7    all three commissioners.  That would have been far more elegant.

8    However, I do not believe that this Court is handicapped in its

9    ability to effect relief based on who is already here.

10          We did during the break pull the case *Grizzle versus*

11    *Kemp*, 634 F.3d 1314, in the Eleventh Circuit.  In that case

12    there was a similar factual issue that a secretary of state

13    asserted, that because he didn't have the actual authority to do

14    what they wanted him to do that this was incomplete -- these

15    were incomplete parties, kind of similar to what we have here.

16    But as the chair of the commission that was in charge of that

17    issue, the order was properly issued to him.

18          I also stand with our Rule 25 argument that we could

19    substitute out somebody.  I also believe that we could impose an

20    order on Commissioner Coonrod herself, as the chair, to call an

21    appeal where my client would get actual due process as required

22    by not just the Due Process Clause, but as required by the

23    Florida Constitution's Victims' Bill of Rights.  I think that

24    Commissioner Coonrod could be enjoined and compelled to do so

25    with a fresh set of eyes.  It appears that even appeals for the

1   inmate themself go to the two people that already told them the

2   answer in the first place.  That does not seem to me to be due

3   process for a crime victim herself.

4          THE COURT:  And you're focusing on the concept of

5   there's no meaningful opportunity to be heard; correct?

6          MR. RANDAZZA:  Correct.  And that's --

7          THE COURT:  So, Judge, it's no answer to say you can

8   send a letter.  You can send a letter tomorrow to a court asking

9   them to do something, but just because you can send them a

10  letter doesn't mean that you have been afforded due process

11  because there has to -- it has to be -- the operative qualifier

12  is it has to be a meaningful opportunity to be heard; right?

13         MR. RANDAZZA:  That would be our position.

14         THE COURT:  And you are saying, Judge, on this record

15  there's no -- we've established there's no meaningful

16  opportunity to be heard for Ms. Foy, who the State has

17  designated as a victim and barred her from seeing her son.

18         MR. RANDAZZA:  That is our position, Your Honor.

19         Additionally, I think -- if the Court feels that it

20  needs all three parties here in order to do that, I think that

21  we could do that in an expedited way, as we've already

22  suggested, with amendment and relation here without another

23  hearing, and then this could all be decided on the papers and

24  this testimony.  It isn't as if these are unrelated third

25  parties.  Their counsel is here.  Their arguments are no

 1    different than Commissioner Coonrod's.

 2            As far as the level of scrutiny to look at the State's

 3    action for -- I don't believe that *Turner* is the correct

 4    standard.  This is not a penological issue.  This is an issue

 5    confronting her rights.  So if we want to look at what we can do

 6    as far as separating her from her family, that still has to be

 7    looked at under strict scrutiny.

 8            Perhaps if the State had shown some compelling reason

 9    or even some legitimate reason that Mr. Foy cannot communicate

10    with his mother -- as Your Honor noted, why is it all contact?

11    Why is it no telephone contact, no email, no Zoom?  And,

12    frankly, why not supervised visits?  There are so many different

13    ways to handle this problem.

14            And, frankly, if he were given full access to her, I

15    think, as we've shown on this record, that is more likely to

16    achieve the government's interests than what it's doing now.  It

17    seems that they are setting him up.  Perhaps he is an -- I have

18    confidence after hearing his testimony that he's not going to

19    fail, but if he is going to fail -- if you want to bet on him

20    failing separated from the one family member that he has, the

21    one person who is willing to do whatever it takes to ensure

22    that -- that if he has -- time provision in the release document

23    is interpreted as he will have time, she will make sure he has

24    that time, I think we're setting him up for success, not for

25    defeat.

1          I just do not see -- and I see nothing on the record

2     that makes any sense as far as why he is this separated, why he

3     is unable -- why she is unable to simply surrender her status.

4     This is your final -- without getting into the constitutional

5     issues, if she can surrender her status as victim -- now, she

6     will lose a litany of rights as well that come under the Florida

7     Victims' Bill of Rights, but she was never asked if she wanted

8     to be a victim.  She was never asked if she wanted that status.

9     She was never asked to testify.  Her son simply pled out.  The

10    only time the State of Florida has ever heard her words was in

11    that unmeaningful exchange of less than five minutes where she

12    was told they weren't going to listen to her.

13          So this is -- and this is not, I think, a case

14    where -- if you do grant this family the right to be together, I

15    don't think you are creating a situation that is ripe for abuse.

16    In fact, I don't see how it could be.  I have never been able to

17    find a case -- and we have diligently looked -- where the victim

18    was this motivated to be with their assailant and they have the

19    mother-son relationship.

20          This relationship is so fundamental, so sacred, that I

21    think it challenges even substantive due process, which I know

22    is a doctrine that has been largely gutted.  But it does shock

23    the sensibilities of anybody to look at this and say, Why?  Why

24    would the State be so inflexible, so unwilling?  And they have

25    one possible resolution that they offered to us, and that was

1    send him back to jail, and then she can go back to having her

2    relationship with him.

3         And it just -- you know, in some cases you wonder --

4    when government activity looks like this, you ask yourself, Is

5    the cruelty the point of it?  I don't know if that is, but I

6    just don't see any governmental interest here, except engaging

7    in what I -- I just have never seen a case in which the

8    government has engaged in such unthinking cruelty.  And Ms. Foy,

9    I think, deserves to live out the rest of her life with her

10   family.

11        Thank you, Your Honor.

12        MR. NEWHALL:  Briefly, Your Honor.

13        The Commission has to evaluate these cases in a way

14   that they believe will protect the public, and I believe

15   that's -- I respectfully submit that's what they have done in

16   this case.  They have looked at someone who has repeatedly

17   fallen back into serious drug abuse.  As a result of that drug

18   abuse, he assaulted -- viciously assaulted the one person who he

19   claims to be the most important to him in the world.

20        He's been out of prison now for six weeks.  I think we

21   all hope that he does very well, but I believe that -- I

22   respectfully submit that the Commission looks at this with some

23   degree of honest skepticism.  He's never been able to

24   successfully kick this habit before, at least not when he's

25   behind prison walls.

1            So the question becomes is the -- the Commission is

2    charged by statute with doing what they believe is necessary to

3    protect the interests of the public.  That includes crime

4    victims.  What interest does the State have?  Well, the State

5    has an interest in not having Ms. Foy relapse and not having him

6    go back to prison and not having to arrest him again.  So the

7    State -- the Commission has taken those things into effect and

8    made a decision.

9            Is it the same decision that everyone would have made?

10    Perhaps not.  But, as Your Honor pointed out, there are a lot of

11    times when these factors give commissioners and judges red flags

12    when prior victims of a crime suddenly express a great desire to

13    be back with a person who has done them harm in the past.  Given

14    that, the condition of no victim contact is, I submit, entirely

15    reasonable.

16            Legally we respectfully submit that Ms. Foy lacks

17    standing.  The no-contact provision is personal to her son, to

18    Scott Graham-Foy, and not to her.  We've cited cases in the

19    brief, and I won't read them to you again.  But Ms. Foy does not

20    have standing to challenge that condition.

21            So when you look at the four elements of a preliminary

22    injunction or that must be satisfied for the issuance of a

23    preliminary injunction, the first is, of course, a substantial

24    likelihood of success on the merits.  Because Ms. Foy lacks

25    standing, she has no likelihood of success on the merits.

1          Will an irreparable injury be suffered unless the

2    injunction issues?  Well, any injury that she is suffering

3    because she cannot have contact with her son is, again -- and I

4    don't say this to be mean, but it's entirely the responsibility

5    and the consequence of the actions of her son who, as a habitual

6    felony offender, battered her, severely battered her.  So any

7    injury that Ms. Foy may claim is simply incidental or collateral

8    to the fact that Mr. Foy's rights have justifiably been a

9    concern as a right of his conditional release from prison.

10          And this case gives me no pleasure, Your Honor.  I

11   mean, we've all had mothers.  We've all loved our mothers.  But

12   the Commission here was faced with a situation not of a

13   relationship between a mother and a son, but the relationship

14   between a felon and the victim of that felon, and they have to

15   evaluate this in a way that is going to give the public and

16   Ms. Foy, respectfully, the best likelihood of no further harm

17   occurring.

18          For all the reasons I've laid out, Your Honor, the

19   plaintiff has no -- I would respectfully submit, at least, does

20   not have a substantial likelihood of success on the merits, and

21   the preliminary injunction should be denied.

22          Now I'm going to let Sara Spears address the remaining

23   factors.

24          THE COURT:  Certainly.  Welcome.

25          MS. SPEARS:  Thank you, Your Honor.

1          I'm just going to address the last two elements of the

2  analysis for a preliminary injunction.  That's the balance of

3  equities and the public interest when -- in favor of denying a

4  motion.

5          Plaintiff has repeatedly alleged that the no victim

6  contact condition serves no legitimate interest of any kind, but

7  that's not the case.  One of the most important, if not the most

8  important, state interest is protecting the public welfare and

9  safety.  That's exactly what the condition does.  Here it's not

10  in the public interest to allow a victim to effectively waive

11  that protection when it's a condition of release imposed on her

12  assailant.  This is true even when the victim is a family member

13  and especially when Florida law deems the assailant to be a part

14  of a group that poses the greatest threat to public safety.

15          I just want to note that Section (8) of the

16  Conditional Release Program Act provides the legislative intent

17  behind the program, and in Section (8), the Legislature found

18  that the offenders who are eligible for a conditional release

19  pose the greatest threat to the public safety out of all of the

20  offenders on community supervision.

21          Mr. Graham-Foy qualified for a conditional release

22  under two of the three qualifications.  First, he committed a

23  Category 4 crime, a violent personal crime, and had previously

24  served a felony commitment, and the second way was that he was

25  sentenced as a habitual offender.

1           The Commission is the entity best suited to determine

2     which conditions of release are appropriate for a given

3     offender.  Entering an injunction here could undermine the

4     Commission's authority in making those judgment calls, and it

5     would interfere with the Commission's duty under the law.

6           And I would also add that Florida Statute Section

7     947.002 provides that an offender's prior record is the best

8     predictor of recidivism.  We've seen Mr. Graham-Foy's record,

9     and the Commission exercised its duty to protect Ms. Foy by

10    imposing the condition of release.

11          Last, the State has a substantial interest in

12    protecting the victims of brutal attacks.  In fact, the State

13    has a duty to protect victims and to prevent victims from being

14    revictimized.

15          In 2018, as my co-counsel pointed out, Florida voters

16    passed a constitutional amendment to add the victims -- the bill

17    of rights for victims in Article I, Section 16.  The

18    Constitution delineates a victim's right to be reasonably

19    protected from the accused and the right to have their safety

20    and welfare considered.  The Commission's no victim contact

21    condition protects plaintiff and clearly considers her safety

22    and welfare.

23          Further, victims' rights just don't include a right to

24    dictate the conditions of release of their own assailant.

25    Victims are entitled to be informed, to be present, and to be

1   heard, but not to exercise control over the decisions of the

2   Commission.

3          THE COURT:  Well, let me ask you that, since you just

4   said that, because that -- it seems to me that's the nub of the

5   case, which is what I was asking the other lawyers about

6   earlier.

7          When you say "victims are entitled to be informed, to

8   be present, and to be heard" -- I understand it's possible that

9   somebody doesn't get notice.  There is a variety of reasons why

10  that is.  I can't manage to get a birthday card to my neighbor

11  without it going through Jacksonville if I'm mailing it.  So I

12  understand that there can be notice issues.  But Ms. Foy ended

13  up getting notice.

14         I'm struggling, since we are talking about process and

15  due process, if there is an underlying constitutional claim, for

16  example, the freedom to -- or the right of association, how is

17  the -- and so you're informed, and if you're informed, they can

18  be there.  The public can be there.  But where is the

19  opportunity to be heard?  I keep focusing in on that because

20  we're told -- she's told she doesn't have the right to be heard.

21  Nobody has pointed to any provision where she has the right to

22  be heard.

23         It may not be determinative, but I am struggling with

24  this concept of you have a right to be heard, but you have a

25  right to be heard if you want to come speak at sentencing.  For

1    example, under the federal system, which is different provisions

2    than you're talking about, I have to allow the victim to be

3    heard at sentencing.  You have a right to show up and say, Don't

4    release them on, you know, parole.  I'm terrified.  They have

5    their brothers and sisters reaching out to me.  So we'll

6    entertain that.  And you have a right.

7         But can you point to me -- where do you have the right

8    to be heard if you're saying, "I believe, after 13 years of

9    being clean, my son doesn't represent a danger.  I think the

10   best way to keep him from being a recidivist is to have my love

11   and comfort and support"?

12        Because we are, after all, the State of Florida, the

13   Florida -- the state that believes in the sanctity of family and

14   the strength of family and the sanctity of life, even of the

15   unborn.  So given all those stated interests of Florida, where

16   is Ms. Foy's opportunity to be heard in any rule or regulation

17   or administrative code provision as it relates to the parole

18   commission?

19        MS. SPEARS:  I'm -- I think I misplaced the rule that

20   I had printed out, but there is a commission rule that states

21   that victims have the opportunity to be heard through letters or

22   writings, and that's exactly what she did when she submitted

23   those several letters to the Commission.  My understanding as to

24   their response when she called in was that that type of hearing

25   was not open for public comment, and that's why they weren't

1    going to take testimony.

2          THE COURT:  So the right to be heard is the letters,

3    and, Judge, you have before us in the record the letters she

4    sent in.  They just chose to not agree with the request in those

5    letters, which, Judge, they're free to do, and you do not sit as

6    a super review board of decisions made by the parole commission.

7    She had the opportunity to be heard through the letters.  They

8    rejected those letters, and you don't get to second-guess that

9    determination.

10          MS. SPEARS:  I wouldn't quite put it that way, but

11    essentially that's correct.

12          THE COURT:  I wasn't saying that in a pejorative

13    sense.  It's almost like I don't get -- if there's not an

14    independent constitutional violation, I don't get to sit and

15    review employment decisions.  That's Title VII case law.  So I

16    didn't mean it in a negative sense.  I just meant that assuming

17    that there's not a constitutional violation, courts don't get to

18    sit as super review boards of decisions made by commissions such

19    as this and second-guess their decisions.  There has -- in order

20    to reach their decision, there has to -- you have to show that

21    there's been a constitutional violation.  For the reasons y'all

22    have expressed, there is none here.

23          MS. SPEARS:  That's correct, Your Honor.

24          THE COURT:  I understand.

25          MS. SPEARS:  Thank you.

1           THE COURT:  Counsel, anything in reply?

2           MR. RANDAZZA:  Yes, Your Honor.

3           Again, on this relief issue, I am -- I believe that

4    she does have standing.  There is yet another case I can provide

5    you a citation for, *Bailey versus Board of Commissioners of*

6    *Louisiana Stadiums,* 441 F.Supp. 3d 321 at 337 to 338.  I

7    understand it's not binding because it's the Eastern District of

8    Louisiana.

9           THE COURT:  It may be persuasive, though.  What did

10   the judge have to say?

11          MR. RANDAZZA:  Well, in that there's only one member

12   of a board of seven that was sued, but the judge had to say that

13   that could still afford the relief sought.

14          THE COURT:  All right.  I'll be -- I assure you I will

15   read that decision.

16          MR. RANDAZZA:  Thank you, Your Honor.

17          As far as any argument that she does not have

18   standing, she is -- I just -- I can't -- I can't agree.  I can't

19   think of a -- perhaps I don't represent people usually who are

20   in such dire straits.  I'm sure there are people who are before

21   you who are harmed more every day, but this, to me, is the most

22   harmed client I've ever had.  This is somebody who has done

23   nothing wrong.  And, yes, she loses her family for 13 years.

24   That's a consequence of her son's drug addiction and her son's

25   actions, but she also had him for most of that time.  She was

1  able to still have a relationship with him.

2           It just seems that there can be no -- no rational

3  basis for saying that the public needs to be protected, so we're

4  going to turn this man loose on the entire public, except for

5  the only person who loves him, the only person who will care for

6  him.  My mother can go hang out with him.  You know, any

7  vulnerable person has access to him.  The only person who

8  doesn't is the only person willing to come into federal court to

9  say, Please, Your Honor, give me the right to be with my son.

10          I think if we're balancing the hardships here, I just

11  don't see any hardship to the government.  I do see a hardship

12  to the government if he happens to fail.  But, again, everything

13  we've seen here today shows that the relief we're seeking, if it

14  is successful, makes his likelihood of failure so such less.

15          This was not a -- you know, there's always two ways to

16  package the facts.  Twenty-six counts back in -- you know, when

17  the Patriots first started winning Super Bowls, these are all

18  drug-seeking behaviors by a drug addict.  The opiate epidemic

19  has certainly caused enough pain and suffering across this

20  country that we can understand that.  I don't know of anybody

21  who hasn't been touched by that, at least themselves or through

22  a family member.

23          This was a guy who looked for drugs, got caught doing

24  it, and finally found himself -- I mean, I don't know if you are

25  familiar with the language of recovery, but listening to this

1  man talk about rock bottom and where he is, it was very

2  persuasive to me that this is not somebody that we need to worry

3  about deciding that he wants to go out and get high again.  I

4  found his -- the most persuasive thing I found from him was his

5  refusal to promise he wouldn't.  And I know that might sound

6  illogical, but one of the processes in recovery is making

7  amends, being honest after that.  He was honest.  No addict can

8  ever promise they'll never do it again.  But that self-awareness

9  that you heard from him I found compelling.

10        I think the public interest is more protected by

11  keeping families together.  And Your Honor was right.  The way

12  that this state looks at -- this -- this argument might be

13  different in another federal district in another state, but

14  Florida does look at the sanctity of family as important, and I

15  think that that is something that should be taken into account

16  here as well.

17        You know, he could be put -- it seems that if the

18  public is -- should be so fearful of Mr. Foy, he could remain in

19  prison.  They let him out, but why not tell him he has to be

20  under house arrest?  He could be under curfew at her house, and

21  now he's a danger to nobody, except the one person in the whole

22  world who wants to be with him.

23        Florida has made a promise.  It has made a promise of

24  due process, and this is where I really find the lack of due

25  process to be glaring.  In the absence of that promise, I still

1   find an absence of due process.

2          But when the State goes through the trouble of passing

3   Marsy's Law, of passing Article I, Section 16, of the Florida

4   Constitution -- and it says explicitly in section (b)(1) there

5   shall be due process with fairness and respect for the victim's

6   dignity.  I did not see anything in the record so far that comes

7   close to looking at respect for the victim's dignity, nor

8   fairness to the victim's dignity.  This victim winds up alone,

9   missing the one person that would round out her family.

10          It provides that there's a right -- my friend made an

11  eloquent argument in saying that the constitution says that you

12  can be protected from your victim, but there was a word left out

13  of that, the right to reasonably be protected from your victim.

14  If Mr. Foy had even had a Freudian slip in his testimony, if she

15  had -- if there was any indication here that there was a lack of

16  sincerity, I might say perhaps the Florida Constitution's

17  mandate here for what it defines as due process -- it has

18  limited its ability to run over due process with this provision.

19  It's not reasonable protection to leave her alone, unprotected

20  by the one person who would be there to protect her, to advocate

21  for her, to take care of her.

22          And then Article I, Section 16(b)(4) of the Florida

23  bill of victims' rights says that the State has to take into

24  account the welfare of the victim and the victim's family.  Now,

25  I know when these things are written, especially when it is

1   written from the perspective of "we need to be harder on crime,"

2   which is probably where this all came from, but there -- they've

3   got the language that they've used -- where is the consideration

4   for the welfare of the victim and the victim's family?  This is

5   none of the above.  This is simply -- you know, maybe if it was

6   a bigger family, it wouldn't be subject to this, but this is

7   ending this family.

8            There is a very high likelihood that she will not

9   survive the period of time in which she has been barred from

10  being with her son, and if that doesn't offend due process, then

11  I don't know what does.

12           THE COURT:  Thank you.

13           I'm well aware of the importance of setting these

14  matters on an expedited basis.  As you know, as soon as I

15  received the motion, I set it for a scheduling hearing, required

16  the parties to confer.  We had a hearing within a few days, and

17  I set this matter for a hearing.  I know that one lawyer had a

18  conflict.  The other lawyer had a conflict as well, and we set

19  it again, this hearing, as the record reflects, on an expedited

20  basis.  I also don't need to render a case moot by sitting on

21  it.  I realize that much of my docket would go away if I simply

22  didn't rule, and -- but I don't -- I don't do that.  I try --

23  endeavor to get out an order as quickly as possible.

24           There are a number of issues here.  We've addressed

25  some of them.  But even with the last statements made by

1  plaintiff's counsel, we talk about due process, and the question

2  becomes what's the right that you're being denied, how is it

3  defined, do you look to state law, and so forth.  Then, what is

4  a meaningful opportunity to be heard?  So even framed as a due

5  process claim, there are a bunch of moving parts, as counsel is

6  well aware.

7          So I'm going to have to wade through the

8  jurisdictional issues.  I'm going to have to wade through each

9  of the claims.  So I'm not going to be able to get out an order

10  in 24 hours, so let me tell you -- but having said that, that

11  doesn't mean I'm going to wait six months.  So I'll do my best

12  in the next week or so to get an order out.  I can't be more

13  precise than that because I have a lot of other obligations, and

14  I'll do my best.

15          I want Ms. Foy to understand the following -- and I

16  think you do.  You've -- as you've presented, it's clear to me

17  that you're sophisticated and understand what's going on, as

18  evidenced by your remark to the commissioners and a number of

19  remarks that you made when you were on the witness stand.

20          So I hope you understand what I don't get to decide.

21  And I want to make plain this is not suggesting you are going to

22  lose.  I've got to go back and think about this.  But I want you

23  to understand what I don't get to decide.  I don't get to decide

24  what would I do if I was sitting as one of the commissioners,

25  and I think you know that.  I also don't get to decide what's

1    right or wrong, or good or bad.  And if there's an issue with

2    standing, I don't get to try to fix it and then issue the

3    preliminary injunction.

4           And, again, I want to think through -- and I'm going

5    to read the cases your lawyer has cited, but I'll give you an

6    example.  I ruled that the Stop WOKE Act as it applied to

7    universities did not pass constitutional muster.  I then had a

8    case before me that related to high schools, a fascinating case.

9    I spent countless hours researching the law determining what are

10   the contours of secondary school versus college -- and the case

11   law is -- we'll just say it's a bit all over the place around

12   the nation -- and spent weeks getting prepared for the hearing.

13   Then when we went through the hearing, I couldn't reach the

14   merits because there wasn't standing based on how it had been

15   defined and has evolved and been refined by the

16   Eleventh Circuit, particularly in the last few years.

17          And so it's important for you to understand, as a

18   threshold matter I've got to decide, given the posture of this

19   case, can I decide this issue now.  That's the first issue.  And

20   the second issue is I then have got to decide, okay, if I do

21   have jurisdiction to hear it, what's the constitutional claim --

22   what's the constitutional claim that's been violated, and how

23   do -- and then if you get there, if it's been violated, what

24   relief would be granted, if any.  In order to get there, there

25   has to be a constitutional right.  It's not just a sense of

1    equity or justice.

2            I can assure you -- and I heard that a little bit from

3    both sides, even if it was crammed within the four factors of a

4    preliminary injunction, that I don't get to just look at all the

5    facts and say, If I do X, will justice be done?  I'm willing to

6    accept and exercise that power if it was given to me as an

7    Article III judge, but it wasn't, and it isn't, and I don't get

8    to decide that.  So while we can talk about equity -- equitable

9    remedies like injunctive relief, I don't sit in the sense as

10   some super equity judge that decides what do I think is the fair

11   and just outcome.

12           And so, again, I'm not trying to telegraph to you what

13   I'm ultimately going to do.  I'm also not trying to avoid

14   responsibility.  The buck stops with me.  I issue the orders

15   whether -- and people like them or not.  One need only review

16   Westlaw and see the reaction of some of my orders I've issued to

17   know that I clearly don't sit around worrying about what other

18   people think in terms of it being a popularity contest or

19   something.

20           But I hope you understand that there's two things that

21   have to be true.  I have to have jurisdiction, and it's got to

22   be framed as a constitutional violation for me to reach it.  And

23   I think you understand that.  You are shaking your head "yes."

24   By framing it that way, I'm not telling you how I'm going to

25   rule, and I'm also not trying to, again, minimize my role or

1    avoid responsibility.  But I want to make sure you know that.

2            And I think that, at a bare minimum, due process

3    requires me to explain to those that appear in front of me what

4    I can decide and what I can't decide, and I want to make

5    plain -- I think you know this -- I don't get to decide what

6    would I do or what do I think is right or wrong.  It's far more

7    complicated than that.  And I'm going to do my best to wade

8    through the issues and decide, A, is there jurisdiction, and, B,

9    was there a constitutional violation and is there a substantial

10   likelihood of success on that constitutional violation; okay?

11           THE PLAINTIFF:  (Nods head up and down.)

12           THE COURT:  Okay.  Thank you, ma'am.

13           Anything further from plaintiff's counsel?

14           MR. RANDAZZA:  No thank you, Your Honor.

15           THE COURT:  Anything further from defense?

16           MR. NEWHALL:  No, Your Honor.

17           THE COURT:  Okay.  Thank you.

18           Court is in recess.

19       (Proceedings concluded at 5:01 PM on May 2, 2024.)

20                   * * * * * * * *
             I certify that the foregoing is a correct transcript
21   from the record of proceedings in the above-entitled matter.
     Any redaction of personal data identifiers pursuant to the
22   Judicial Conference Policy on Privacy is noted within the
     transcript.
23
     /s/ Megan A. Hague                    5/12/2024
24   Megan A. Hague, RPR, FCRR, CSR        Date
     Official U.S. Court Reporter
25

1    **I N D E X**

2    <u>PLAINTIFF'S WITNESSES</u>                                        <u>PAGE</u>

3    <u>TEENA FOY</u>
     Direct Examination By Mr. Randazza                           5
4    Cross-Examination By Mr. Newhall                            18
     Redirect Examination By Mr. Randazza                        22
5
     <u>SCOTT MICHAEL GRAHAM-FOY</u>
6    Direct Examination By Mr. Greenlee                          25
     Cross-Examination By Mr. Newhall                            38
7    Redirect Examination By Mr. Greenlee                        43

8    <u>TEENA FOY</u>
     Redirect Examination By Mr. Randazza                        45
9

10                         **E X H I B I T S**

11
     <u>PLAINTIFF'S EXHIBITS</u>                    <u>OFFERED</u>   <u>RECEIVED</u>
12
     1        Recording of FCOR hearing           44         44
13

14   <u>OTHER RECORD MADE</u>                                      <u>PAGE</u>

15   Closing Argument By Mr. Randazza                          110
     Closing Argument By Mr. Newhall                           114
16   Closing Argument By Ms. Spears                            117
     Rebuttal Closing Argument By  Mr. Randazza                122
17

18

19

20

21

22

23

24

25